**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00250 (PLF)** |
| **v.** | : | |
| | : | **FILED UNDER SEAL**[1] |
| **PHILLIP BROMLEY,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

For the reasons set forth below, the government requests that this Court sentence Phillip Bromley to a term of incarceration at the top end of the guidelines range calculated by the Court, one year of supervised release, 60 hours of community service, and $2,000 in restitution.

### I.    Introduction

In November 2020, defendant Phillip Bromley was deeply frustrated by what he viewed as the state of the country. He repeatedly texted with his family, friends, and co-workers about the results of the 2020 presidential election, making it clear that he felt the circumstances called for a violent response. For example, he texted that "[t]he punishment for treason is death," and he exhorted others to "be ready for the physical fight to come."   A few days later, he texted the following image:

---

[1] Per the Court's direction in its email to the parties on January 27, 2022, the government is submitting a redacted version of this memorandum, and an unredacted version under seal. A motion to seal the unredacted version is being filed contemporaneously with this memorandum.



As January 6 approached, his rhetoric became even more alarming and violent. In early December, he texted in response to a news article about the electoral process: "Let's just kill all these commie bastards and let GOD ALMIGHTY sort them out." He texted that he felt "we" were "at war"; that he "fear[ed] war is coming"; and that the electoral process was "a coup." Someone else texted "push forward," and he replied: "FIX BAYONETS and push forward!" Referring to the Boston Tea Party, he said: "Do we need to storm the ship and dump all traitorous politicians overboard? Start drowning rats?"

In the immediate lead-up to January 6, 2021, Bromley strategized with his cousin—Gregory Nix,[2] who later traveled with him to Washington, D.C.—about attending the rally scheduled for that day. Bromley thought it "may get violent," and so declined to bring his family. Nix replied that he had "no problem with tar and feathering," and that he planned to "get my pistol permit," and then asked Bromley: "Are we worried about the laws at this time?" Bromley replied: "No, they can't enforce the constitutional [sic] law." On January 2, 2021, Bromley texted a friend: "We are moving the line forward on [January 6]. They don't have enough police or bullets to stop us. Long live our republic and all glory/victory to GOD." He texted another that day that he might

_____

[2] Currently charged in case number 21-CR-678 BAH.

not "come back alive" from D.C.  Bromley drove with Nix and Nix's family from Alabama to Washington D.C. a few days before the riot. On January 5, he texted his wife that the atmosphere was "tense" but that "[t]he fight is tomorrow."

That is the background to Bromley's conduct on January 6, 2021. That day, Bromley berated U.S. Capitol Police officers guarding a door to the Capitol building, then watched as his cousin (Nix) assaulted one of them. After the officers were driven off, Bromley encouraged and helped his cousin to attempt to breach the unguarded doors. When the doors were later opened, Bromley went inside, where he witnessed the shooting of Ashli Babbitt. And when he finally left, Bromley lied about his conduct—to his friends and to the government.

Based on his conduct on January 6, 2021, Bromley pled guilty to a Class A misdemeanor for disorderly conduct under 18 U.S.C. § 1752(a)(2) and admitted that he aided and abetted the destruction of government property.  If not for a delay in the government becoming aware of Bromley's pre-January 6 statements, and other unique facts outlined below, Bromley might well have faced more serious charges.  Given that Bromley has already received a significant advantage with respect to his charges, and in light of all of the conduct described in this Memorandum, the government recommends a sentence at the high end of the applicable range.  Bromley participated in property destruction, unlike nearly all other misdemeanants. Bromley's communications prior to January 6 also contain a vitriol and brutality that is unusual even for January 6 defendants, and that clearly establishes an intent to engage in unlawful, violent conduct. Finally, Bromley was not truthful during a debrief with the government, as explained below.

Bromley's conduct, of course, cannot be viewed in a vacuum. It took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, halt the Congressional certification, and force the Vice President of the United States and

Members of Congress to seek safety. Thus, Bromley did not merely engage in hateful, violent rhetoric; he did so and then drove 12 hours to directly confront Members of Congress who were certifying the vote. Bromley did not merely help vandalize government property; he watched a mob grab, wrestle with, and attack police officers, then helped another rioter attempt to smash a window of the U.S. Capitol so that the mob could gain entry. His misconduct makes him comparable to other felony Section 1512(c)(2) defendants who did not engage in violence and who have pled guilty.  He should be sanctioned accordingly.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

The government refers the Court to the general summary of the attack on the U.S. Capitol. *See* ECF 36 (Statement of Offense) at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.

### Phillip Bromley's Role in the January 6, 2021 Attack on the Capitol

On January 4, 2021, Bromley left Alabama with his cousin Gregory Nix, Nix's wife, and Nix's minor son, to make the 12-hour trip to Washington, D.C. On the morning of January 6, Bromley texted others that there was a fight between "patriots" and "blm/antifa" the night before, and that there was "[a]nother fight coming today."  At 12:17 PM on January 6, he texted that the "horde" was "moving to capitol bldg now."  Bromley and Nix appeared like this that afternoon; Bromley is on the right, Nix on the left:



Bromley, Nix, and Nix's family approached the Capitol's East Front House Doors.  They were among the first rioters to approach these doors, around 2:10 PM. The screenshot below, from U.S. Capitol CCTV footage, shows Nix circled in red (and making an obscene gesture to the camera) as he first approached the doors:



Ex. B at 4:12. The doors were locked, and the rioters could not get in. Bromley arrived shortly

thereafter, as did four U.S. Capitol Police officers. *See id.* at 05:57 (officers arriving), 06:40

(Bromley appears in frame). Nix took up a position directly in front of the officers while Bromley

remained a few feet away, with his hands raised.  Bromley is circled in red below; Nix is in the

foreground:



Six times, Bromley joined the crowd in screaming at the officers, apparently including "honor your

oath!"  *See id.*  at 8:02-8:04, 8:35-8:41, 9:27-9:29, 9:34-9:36, 9:41-9:45, 9:51-9:52. During that

period, the crowd was intentionally squeezing and crowding the officers. *See, e.g.*, *id.* at 07:58.

Within a few minutes, the crowd initiated a series of assaults on the officers, in an attempt to move

them from the doorway. *Id.* at 10:18-11:02. Here is Bromley's cousin striking one officer with his

"Don't Tread on Me" flagpole.



Ex. B at 10:31. Bromley's cousin and other rioters attacked the officers several times. The officers soon redeployed elsewhere, leaving the doors locked. Nix attempted to follow them, now wielding an officer's baton and the flagpole. Bromley interceded and redirected his cousin to the doors, as the next two images depict:



Ex. C at 0:10, 0:24. Bromley's cousin then set to work attempting to breach the doors' glass windows. Nix first attempted to do so with the baton:



*Id.* at 0:26. Bromley then handed Nix a metal object that Bromley had taken out of his pocket:



*Id.* at 0:41. Nix took the item and attempted once more to breach the doors with it.  He failed but,

in the process, likely cracked the glass of the doors' window.

Bromley spent the next approximately 12 minutes milling outside of the doors.  He returned once to yell "Remember your oath!" to the CCTV camera, then again to yell "Take a good look!" while pointing at his face.



Ex. D at 1:39. The doors were opened from the inside by other rioters a few minutes later, around 2:40 PM. Bromley was among the first to enter through the doors:



He sent a text to his wife around this time: "We have stormed the capital!"

Shortly after entering, Bromley turned left, and ended up almost immediately near the entrance to the Speaker's Lobby. The crowd there chanted "Break it down!  Break it down!" as rioters attempted to breach the barricaded entrance. Bromley ultimately witnessed Ashli Babbitt being fatally shot at this entrance. *See generally* Ex. E (depicting the scene before and after Babbitt's shooting). The screenshot below is from the confused moments thereafter.



Ex. F at 0:27. A few minutes later, Bromley's father texted him: "Stay tight! Stay put. Have folks call more to come."  And then: "Doing great. Have national attention. House is shutting down."

Bromley spent nine minutes inside, leaving just before law enforcement forced all rioters out of that part of the building. After he left, he texted others that he could not talk because "[a] woman was shot in front of [him]" and "[s]he is dead."  But Bromley did not leave. He and Nix went to the west side of the Capitol, where a large and violent crowd remained for several hours.

*Bromley's Arrest*

On February 12, 2021, Bromley was charged by complaint with violating 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(e)(2). Bromley was arrested on February 17, 2021, in coordination

with counsel. At the time of his arrest, the government was not aware of the footage above that captures Bromley's and Nix's misconduct outside of a door to the Capitol building. Instead, it had CCTV footage of Bromley and Nix walking in and out of the building, nine minutes apart. Bromley was charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G).

*Bromley's Debrief with the FBI*

On July 21, 2021, Bromley was interviewed by the FBI. Bromley had not received a plea offer from the government at that point; the interview was a precondition to his receiving such an offer. Two reports summarizing the content of that interview are attached as Exhibits A-1 and A-2. During that interview, Bromley was shown snippets from the CCTV footage which only showed him inside the Capitol building. Bromley admitted to entering the building, but stated that "there were no signs, barricades or law enforcement blocking the entrance at this door in to the Capitol." Ex. A-1 at 1. Bromley further stated he did not "destroy or damage anything inside the Capitol." *Id.* at 2. Bromley was specifically asked about violent or assaultive conduct that he had witnessed. He replied that another unknown individual in a hat had "attempt[ed] to move [a U.S. Capitol police] officer by putting the officer in a bear hug," but stated he had not seen any other confrontation or assault on officers. *Id.* When asked what he had done prior to entering the building, he stated that he had been praying before looking up and seeing that the doors had been opened.

During the debriefing interview, Bromley was handed his cell phone. That phone had been submitted for a filter review out of an abundance of caution prior to the debriefing, because Bromley had retained counsel over a month before he was arrested. To avoid the agents being exposed to potentially privileged information on the phone, Bromley was asked to show the agents communications or photographs relevant to January 6 with his counsel present. Bromley showed the agents several text messages to his wife and cousin that the reviewing agents deemed non-evidentiary in nature. Bromley also showed agents photographs taken outside U.S. Capitol Grounds. Bromley then stated there were no photographs or videos on his device of the interior of the Capitol building or of rioters attempting to enter the building. He further stated that the rest of the device's communications were similar to those he had shown officers. *See* Ex. A-2.

*Additional Evidence Discovered Prior to the Plea*

On July 30, 2021—nine days after Bromley's interview—the U.S. Attorney's Office first became aware of Bromley and Nix's misconduct outside of the U.S. Capitol Building, described above, when additional CCTV footage was located.

Based on that additional video of Bromley's and Nix's confrontation with officers and subsequent attempts to breach the Capitol's doors, the government determined that Bromley made the following false or misleading statements, regarding his or Nix's conduct on January 6, 2021, in his debriefing with the FBI:

- Bromley's statement that "there were no signs, barricades or law enforcement blocking the entrance" to the Capitol that he entered implied that he did not know he was not permitted to enter those doors. The new CCTV footage showed that Bromley had seen officers guarding the door just a few minutes before he entered. The officers left only after they

were assaulted, which Bromley witnessed. In addition, the video showed that Bromley knew the doors were locked before they were later opened.[3]

- Bromley's statement that he did not "destroy or damage anything inside the Capitol," *id.* at 2, was untrue. Bromley helped Nix attempt to smash the doors' glass. *See, e.g.*, Dkt. 36 at ¶ 9 (Bromley admitting that he aided and abetted destruction of government property).

- Bromley's statement that he had only seen one assault—by an unknown individual in a hat—was also untrue. Bromley had seen Nix strike an officer several times a few feet in front of him and had witnessed at least one other rioter strike an officer.

- For the same reasons, Bromley's statement he had merely prayed before entering the building was, at best, misleading.

Bromley's false and misleading statements delayed Bromley's prosecution and the investigation into Nix by nine days—the period between the debrief on July 21 and the government's coincidental discovery of the additional CCTV footage on July 30.

When the disparity between Bromley's statements and the new CCTV footage was raised with defense counsel, counsel stated that Bromley had indicated he did not remember all of his or his cousin's conduct that day because of the shock he experienced after witnessing the shooting of Ashli Babbitt. Counsel pointed out that Bromley had not revealed Bromley's or Nix's additional misconduct even to defense counsel, even though defense counsel had first communicated with Bromley on January 7, 2021 and had begun their representation on January 8, 2021.

After reviewing this additional CCTV footage, on September 24, 2021, Bromley was sent a plea offer in which he would plead guilty to Count Two of the Information, charging him with disorderly and disruptive conduct with the intent to disrupt the orderly conduct of Government business in violation of 18 U.S.C. § 1752(a)(2). In the plea agreement's statement of offense,

---

[3] In a letter to the author of the PSR, Bromley contended that because he did inform the government about an altercation with police outside the building, he effectively tipped off the government that police were guarding the door he entered. Bromley's vague statement that, at some earlier time, he had witnessed a confrontation does not clarify his clearly implied assertions that officers were not guarding that door and that he thought he was permitted to enter.

Bromley was also required to agree that he had aided and abetted destruction of government property under 18 U.S.C. § 1361. Bromley agreed to pay $2,000 in restitution. Bromley accepted the plea offer on October 28, 2021, and pled guilty on December 1, 2021.

*Additional Evidence Discovered After the Plea*

After his guilty plea, the U.S. Attorney's Office first obtained a copy of the filtered version of Bromley's cell phone.[4]

On Bromley's phone, law enforcement located a video sent from Nix's son's phone to Bromley on January 7, 2021. The video (apparently taken by a third party) depicts, with Bromley in the foreground, the assaults on law enforcement officers by Nix described above. (A clearer version of the same video, located on an open-source site, is Exhibit F.) Bromley re-sent the video in a separate message to his wife, stating: "This is me trying to stop things from escalating." Bromley also texted his wife on January 7, 2021 about having been "treating" Nix—Bromley is a nurse—on January 6, 2021, apparently after Nix's confrontation with law enforcement. Bromley's receipt and resending of this video of Nix's assault occurred after he witnessed Ashli Babbitt's death, and on the same day Bromley first contacted defense counsel.

Bromley's phone also contained other text messages from January 6-8, 2021. One friend texted him that "Most reports are surfacing that many of the 'violent' people were actually people paid to be there, ANTIFA, etc. Not true patriots." Bromley responded: "I saw no antifa. Just free men and women standing against tyranny and corruption." He texted his wife that he "never had a plan to enter the building," and texted a friend that he "did not participate in any violence or vandalism," omitting that he had helped his cousin attempt to breach the Capitol's doors.

---

[4] The device was substantively reviewed by the FBI starting on December 23, 2021, after the change-of-plea hearing on December 1, 2021. The filtered contents of Bromley's device first came into the U.S. Attorney's Office possession on January 11, 2022.

On January 7 and 8, Bromley texted others things like:

- "Do not talk about anything related to what I told you."

- "Do not talk about anything I texted you please."

- "Do not talk about anything I texted you, I have been in shock, information not accurate."

Finally, on Bromley's phone, the government found all of the text messages quoted in the introduction to this sentencing memorandum, including those with Nix in December 2020 about violence, "tar and feathering", and disregarding the law.  Other texts include:

- On December 21, 2020, Bromley texted other individuals: "**Armed militia taking over Oregon capital building now**."  Another individual replied: "The good guys?"  Bromley replied: "**Patriots**".

- On December 23, 2020, Bromley received a text with an image containing a fake quote attributed to U.S. Congresswoman Alexandria Ocasio-Cortez that ended with: "Unity or war The choice is yours."   Bromley re-circulated it, adding "**War it is then bitch!  I call dibs on her boys.**"  And, later: "**They are leaving us no choice. This makes me even more confident in going.**"

- On December 30, 2020, Bromley texted an image stating: "**The Silent Patriot. The day is coming when Good People will be forced to do bad things to bad people**."

- On December 31, 2020, Bromley replied "**Yes sir, at gun point**." to the following text message he received:

16



- On January 1, 2021, Bromley texted a photograph of turkeys in a field. Another individual replied: "About time to start killing". Bromley replied: "**Turkey or traitors**?"

Bromley had not disclosed any of these text messages—including those from January 6, 7, or 8—to the government at the debriefing in July 2021.

### III.   Statutory Penalties and Sentencing Guidelines

#### A.  The Statutory Penalties

As noted by the plea agreement and the U.S. Probation Office, for his violation of 18 U.S.C. § 1752(a)(2), the defendant faces up to 12 months of imprisonment, a term of supervised release of up to one year, and a fine of up to $100,000. *See* 18 U.S.C. §§ 3571(b)(5), 3583(b)(3). The defendant must also pay restitution under the terms of his plea agreement.  18 U.S.C. § 3663(a)(3).

#### B.  The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

17

Those Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 49. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101; *see also Rita v. United States*, 551 U.S. 338, 349 (2007). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "*significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). Where they apply, the Guidelines unquestionably provide the most helpful benchmark for the Court in ensuring consistency and fairness across the hundreds of Capitol riot cases.

The plea agreement provides that the agreed Base Offense Level under USSG §2A2.4(a) is 10. It further states that the government would agree that Bromley was eligible for a 2-level reduction for acceptance of responsibility under USSG §3E1.1(a), absent certain circumstances indicating conduct inconsistent with acceptance. The agreement states that the estimated total offense level is "at least 8." *See* Dkt. 37 at ¶ 5. The plea agreement estimated Bromley's sentencing guidelines range as 0 to 6 months, based on the above estimated offense level and an estimated criminal history category of I. *Id.* ¶ 5.C.

The PSR calculates Bromley's adjusted offense level as follows:

| | |
|---|---|
| Base Offense Level (USSG §2A2.4(a)) | 10 |
| Obstruction of Justice (USSG §3C1.1) | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 10 |

*See* PSR ¶¶ 45-53. The PSR calculates Bromley's criminal history as category I. PSR ¶ 56.

Bromley's Sentencing Guidelines range is 6-12 months' imprisonment under the Probation Office's calculation. This range is higher than the 0-6 month estimated range in Bromley's plea agreement because of the Probation Office's application of a two-level enhancement for

obstruction of justice under Section 3C1.1 of the guidelines.  Section 3C1.1 states that increase is appropriate if the Court determines, by a preponderance of the evidence, that the "defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instance offense of conviction." U.S.S.G. § 3C1.1(1). The guidelines provide a non-exhaustive list of obstruct conduct that warrants an enhancement under this provision, including "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." *Id.* n. 4(G).

The government defers to the Court's determination of whether Section 3C1.1 applies on these facts, and, consistent with the plea agreement, the government is prepared to address any questions the Court has regarding the calculations above.  The plea agreement reserves the following rights to both parties:

- The Government and your client reserve the right to describe fully, both orally and in writing, to the sentencing judge, the nature and seriousness of your client's misconduct, including any misconduct not described in the charges to which your client is pleading guilty, to inform the presentence report writer and the Court of any relevant facts, to dispute any factual inaccuracies in the presentence report, and to contest any matters not provided for in this Agreement.

- The parties also reserve the right to address the correctness of any Sentencing Guidelines calculations determined by the presentence report writer or the court, even if those calculations differ from the Estimated Guidelines Range calculated herein.

- In the event that the Court or the presentence report writer considers any Sentencing Guidelines adjustments, departures, or calculations different from those agreed to and/or estimated in this Agreement, or contemplates a sentence outside the Guidelines range based upon the general sentencing factors listed in 18 U.S.C. § 3553(a), the parties reserve the right to answer any related inquiries from the Court or the presentence report writer and to allocute for a sentence within the Guidelines range, as ultimately determined by the Court, even if the Guidelines range ultimately determined by the Court is different from the Estimated Guidelines Range calculated herein.

Dkt. 37 ¶ 7.

**1. Substantial Assistance to Authorities under U.S.S.G. § 5K1.1**

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). All of these factors weigh in favor of a significant term of incarceration here.

A.  **The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms. By its very nature, the attack defies comparison to other events.

Nonetheless, the government assesses each rioter's conduct on a spectrum, and suggests the Court look to a number of critical factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or

destruction; (5) whether during or after the riot, the defendant destroyed evidence or obstructed justice; (6) the length of the defendant's time inside of the building, and where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

This is the unusual case in which essentially all of those factors favor a serious sentence of incarceration. Indeed, the significant aggravating factors here render this case similar to a non-violent Section 1512(c)(2) felony case, not other misdemeanor cases.

*First*, Bromley, unlike nearly all misdemeanant defendants, encouraged and then participated in the destruction or attempted destruction of government property. Bromley pointed Nix directly to the outer doors of the Capitol building, encouraging Nix to smash on them with a waiting mob ready to enter the building. This was not merely, as Bromley may claim, a ruse to distract Nix. Because when Nix was unable to breach the doors using a baton, Bromley handed him a different metal tool to use. Indeed, Bromley admitted that he aided and abetted destruction of property under 18 U.S.C. § 1361. *See* ECF 36 at ¶ 9. (Bromley's offense level for a Section 1361 charge would have been lower than the charge to which he pled, a violation of 18 U.S.C. § 1752(a)(2).)

To be clear, this is utterly unlike an ordinary destruction of property case, in which the guidelines range is driven primarily by the value of the damaged property. *See* U.S.S.G. 2B1.1(b)(1). Bromley did not just deface the exterior of a government building or damage an idle government vehicle. The guidelines rightly judge those offenses based on the damage involved, because that is a good approximation of the harm to the government. But here, Bromley's property

destruction was for an ulterior, nefarious end: gaining entry for him and the mob to the Capitol building. Attempting to violently breach the door to the seat of the nation's legislative power, with members of Congress and the Vice President inside, and when backed by a rancorous mob eager to enter for unknown but hostile purposes, is leagues different than throwing a rock through the window of a closed federal facility at night. It should be sentenced differently, too.

*Second*, without belaboring the point again here, Bromley's false and misleading statements to the FBI also differentiate him from most rioters. His numerous misleading statements appear to have been designed to hide information from the government about his relative's and his own misconduct at the Capitol.

*Third*, Bromley's violent rhetoric in the lead-up to January 6 makes clear that he knew full well the implications of his breach of the Capitol. Bromley referred at various times after the election to "kill[ing]" Democrats, "kill[ing] all these commie bastards," "drowning" "traitorous politicians," and "kill[ing]" "traitors."  He stated there was a "physical fight to come," that he believed they were in a "war" and that there was an ongoing "coup," that others should "FIX BAYONETS and push forward!", and that the people should rise up and tell Congress "to kiss their asses" "at gun point."  He suggested he was claiming "dibs" on attacking or otherwise harming a Member of Congress. He sent a picture of a bullet to others, noting that the colonists did not peacefully protest the British; "[t]hey fucking shot them."  He texted others that the "armed militia" who breached the Oregon state capitol building were "Patriots."[5]  And most pertinently, he texted with his cousin Gregory Nix, in planning their trip to D.C., that he anticipated "violence,"

---

[5] Details of the Oregon State capitol building's breach can be found, for example, here: C. Radnovich, V. Barreda & W. Woodworth, *Video shows Rep. Mike Nearman opening door to protesters at Oregon Capitol*, Salem Statesman Journal (Jan 8, 2021), https://www.statesmanjournal.com/story/news/2021/01/07/oregon-rep-mike-nearman-allowed-protesters-in-state-capitol-building/6583097002/.

and when Nix said he was fine with tarring and feathering politicians and inquired about bringing a weapon, Bromley said they should not be "worried about the laws at this time."   Again, Bromley's conduct, when combined with these later-discovery statements, would have been sufficient to charge Bromley with a felony under Section 1512(c)(2). He was only not charged with that offense due to the delayed receipt of his communications and the other unique facts relating to his debrief discussed in the statement of facts and in Section III.B.1, *supra*.

The other factors similarly cut against Bromley. Bromley's entry to the building occurred after Bromley had witnessed assaults on law enforcement officers and an attempt to breach locked doors. That is far different from those who entered an already open door and did not witness prior confrontations or encounter the same level of resistance from law enforcement.

While Bromley spent roughly 10 minutes inside the Capitol—not as long as some, but on par with other misdemeanants—that is largely due to the circumstances of his entry. Bromley's progress inside was quickly blocked at the entrance to the Speaker's Lobby. Within just a couple of minutes, after the crowd's violent and destructive attempts to get into the Lobby, Ashli Babbitt was shot. Law enforcement arrived in force almost immediately, cornered the rioters, and herded them out of the building. Bromley left approximately five minutes after Ms. Babbitt was shot. But simply by virtue of where and when he entered, he could not have remained in the building any longer.  His short duration in the Capitol does not count in his favor.

Finally, in terms of his reaction to violence, Bromley does appear to have redirected Nix away from following officers on one occasion. But as part of that interaction, Bromley patted his cousin on the head, as if to congratulate him for his earlier violent assault—as if to say: "You've done enough."  *See* Ex. C at 0:08-0:13. Plus, Bromley redirecting Nix could be interpreted in one of two ways. Bromley will presumably suggest he tried to distract Nix. But the alternative is that

Bromley's purpose was not humanitarian (to prevent violence), but criminal: to get into the building. That latter explanation is more consistent with the fact that Bromley then eagerly watched his cousin attempt to breach the door before handing him a new object that Bromley apparently thought would do the trick. (And, of course, with the fact that Bromley later went into the building.) Bromley deserves no credit for redirecting his cousin from one illegal task to another, when breaching the building near the Speaker's Lobby may have ended in an even more violent outcome.

These factors all weigh heavily in favor of a significant sentence of incarceration at the top end of the Sentencing Guidelines range as calculated by the Court.

**B.  The History and Characteristics of the Defendant**

Bromley has no criminal history, a fact which counts in his favor. PSR ¶ 55. He is a nurse and a veteran, having served in the U.S. Army Reserves and later in the National Guard. *Id.* ¶ 94. As the government has noted in other Capitol riot cases, however, a defendant's prior military experience is both a mitigating and aggravating factor in these unusual cases. Those who swore an oath to protect their country are, at the bare minimum, expected not to engage in direct criminal action to undermine its core democratic values and institutions. Moreover, Bromley's more violent communications in the lead up to January 6, 2021 are more credible and disturbing given his military background. Those communications were not merely to family members; he sent the messages quoted above to family; extended family; friends; and even co-workers at the hospital where he worked.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law and a "national disgrace." *United States v. Stotts*, 21-CR-272, Tr. 11/9/21 at 31 (Judge Kelly). As this Court has previously said, what "came to be" that day "was a riot, was an incitement, was an

25

insurrection, was an obstruction of one of the branches of our government" with "long-term effects about how the legislative branch functions and how it's still threatened and on tenterhooks" that are "incredibly problematic for a democratic society." *See United States v. Ehrke*, 1:21-cr-97-PLF, Tr. 9/17/2021 at 15.

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from violent felonies to misdemeanors. Even in cases involving Class B misdemeanors, this Court and others in this district have made clear that probation is not the baseline or expected sentence for misdemeanant rioters. *See Ehrke*, Tr. 9/17/2021 at 13; *United States v. Bustle et al.*, 21-cr-238, Tr. 08/24/21 at 3 (Judge Hogan: "As to probation, . . . I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected").[6] This was not a peaceful protest, or a driving offense in a National Park, or a victimless, minor drug offense. What occurred on January 6 is clearly incomparable to run-of-the-mill misdemeanors.

But this case is not even comparable to most misdemeanors. Bromley pled guilty to the Class A misdemeanor involving disorderly conduct, and agreed that he committed another offense, aiding and abetting property destruction, in his statement of offense. His statements of intent,

---

[6] Early in this investigation, the Government made a very limited number of plea offers in Section 5104 misdemeanor cases that included an agreement to recommend probation, including in *United States v. Morgan-Lloyd*, 21-cr-164-RCL; *United States v. Ehrke*, 21-cr-97-PLF; *United States v. Bissey*, 21-cr-165-TSC; *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF); and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

uncovered after the change-of-plea hearing, make his conduct more akin to a Section 1512(c)(2) offense that does not involve direct violence against officers.

### D.  The Need for the Sentence to Afford Adequate Deterrence

In this case, both general deterrence and specific deterrence require a significant sanction. 18 U.S.C. § 3553(a)(2)(B)-(C). General deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was intended to, and did, interfere with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing in *United States v. Hodgkins*, 21-cr-188:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. This Court has made similar remarks, which the government endorses. *See Ehrke*, Tr. 9/17/2021 at 13; *see also United States v. Gallagher*, 21-cr-41, Tr. 10/13/2021 at 37 (Judge Nichols: "Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred."); *United States v. Mazzocco*, 21-cr-54, Tr. 10/4/2021 at 24 (Judge Chutkan: "What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government."). The gravity of these offenses demands deterrence. And it is important to convey to future potential rioters that their actions will have consequences. This is the most important factor that this Court must consider.

A significant sentence is also necessary to deter Bromley specifically. Bromley's violent and hateful rhetoric from before the election reveals an individual who was easily enticed into a web of disturbing misinformation—and who was on the apparent brink of taking drastic action. He spoke of a coming "fight," and "war," and repeatedly took others' messages and modified them to make them significantly more violent. And this was not simply cheap talk amongst friends about political events. Bromley was sufficiently determined that he drove for 12 hours to reach Washington D.C. to confront the evil he apparently believed inhabited this city, thinking no amount of "police or bullets" would stop him.

That determination was borne out in his conduct. Bromley saw his cousin and others assault officers to the point of driving them from the doors he wished to enter. That violence should have been a wake-up call that he and his cousin needed to leave. Instead, Bromley helped his cousin attempt to breach the Capitol. He and Nix then waited for 12 minutes—again, long enough for cooler heads to prevail—and still decided to go into the building when the doors were opened. And Bromley did all of this with his cousin's minor son watching and, at times, participating— participation Bromley did little to stop.

Finally, it is problematic that Bromley minimized and made false and misleading statements about his conduct even after apparently recognizing his conduct was wrong.  He texted his father and wife shortly after January 6 that he had not initially intended to enter the building, and told others he engaged in no violence or vandalism. While the latter claim is, by now, clearly untrue, that he did not celebrate his conduct does indicate at least some shame over what he and his cousin had done that day. Bromley then indicated to the government, through counsel, that he was ready to plead guilty relatively quickly. The difficulty is that Bromley then continued to minimize his conduct during the debrief after that seeming change of heart. That raises the

possibility that he was eager to plead guilty to the misdemeanors with which he was originally charged in the hope that the government would not uncover his other misconduct. Whether that is true or not—and it is certainly one reasonable interpretation of Bromley's conduct—Bromley's failure to tell the truth during his debrief makes it impossible to conclude with any confidence that he has moved past his illegal conduct on January 6, regardless of what he says now.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

A comparison to other rioters also makes clear that a sentence at the top of the sentencing guidelines range as calculated by the Court is appropriate.[7]  *See* 18 U.S.C. § 3553(a)(6). "The best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. Here, the appropriate pool is comprised of other Capitol breach offenders because the Capitol breach was *sui generis*.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here—most notably the combination of pre-January 6 rhetoric, property destruction, and subsequent misleading statements to the FBI—Bromley's conduct is not comparable to that of other misdemeanants.  It is most closely comparable to that of non-violent felony rioters, like Paul Hodgkins. *See Hodgkins*, 21-cr-188-RDM, Dkt. 32 (D.D.C. filed July 14, 2021). Hodgkins entered the Senate Chamber, but lacked the three aggravating factors present

---

[7] Attached to this memorandum is a table with information about the sentences imposed on Capitol breach defendants where the government has requested incarceration. *See* Ex. H. That table also shows that a sentence at the top of the calculated guidelines range would not result in unwarranted sentencing disparities.

here: he did not engage in property destruction, as Bromley did; he did not have the same aggressive and violent rhetoric that Bromley did; and he did not make false and misleading statements months later like Bromley did. *See id.* at 3-4. Indeed, Hodgkins was cooperative, provided a full accounting of his conduct, and asked to plead guilty quickly. Hodgkins received a sentence of 8 months. A similar sentence for Bromley, who in several ways engaged in more deliberate misconduct and appeared to arrive with a more volatile intent, would be appropriate. Another defendant who pled guilty to a Section 1512(c)(2) charge but not another violent offense was Jacob Chansley, who received a sentence of 41 months' imprisonment. *See United States v. Chansley*, 21-cr-3-RCL, Dkt. 92 (D.D.C. filed Nov. 17, 2021). And finally, defendant Troy Smocks was sentenced to the top end of the guidelines range, 14 months' imprisonment, after being convicted of issuing a threat under 18 U.S.C. § 875(c) directed at Members of Congress and others on January 6. *See United States v. Smocks*, 21-cr-198-TSC, Dkt. 67 (D.D.C. filed Dec. 3, 2021). Smocks' threat was: "So over the next 24 hours, I would say, lets get our personal affairs in order. Prepare Our Weapons, and then go hunting. Lets hunt these cowards down like the Traitors that each of them are. This includes, RINOS, Dems, and Tech Execs. We now have the green light. [All] who resist Us, are enemies of Our Constitution, and must be treated as such." *Smocks*, Dkt. 59, at 3. Bromley's statements were made privately, were less targeted, and occurred in the weeks leading up to January 6, not on that day. But they displayed a similar glorification of violence. And Bromley, unlike Smocks, actually entered the Capitol.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). "[D]ifferent district courts can and will sentence differently . . . from how

other district courts might have sentenced that defendant." *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008). In other words, this Court should focus on what sentence is appropriate given Bromley's specific aggravated misconduct.

## V.     Conclusion

This Court should sentence Bromley to the top end of the guidelines range as calculated by the Court, one year of supervised release, 60 hours of community service, and $2,000 in restitution. That sentence is necessary in this unique case. Bromley assisted others in attempting to breach the doors to the Capitol—after he witnessed a violent assault on the law enforcement officers guarding those doors. He came to the Capitol that day having displayed a hostile, violent animosity toward government and Congress.  This is an aggravated case on par with many felony obstruction cases. Bromley should be sanctioned accordingly.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

*/s/ Christopher Cook*
CHRISTOPHER COOK
Assistant United States Attorney (Detailed)