## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **V.** | ) | **CASE NO. 21-000250-001** |
| | ) | |
| **PHILLIP BROMLEY,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## DEFENDANT RESPONSE TO COURT'S
## ORDER DATED MAY 10, 2022

COMES NOW, the Defendant Phillip Bromley, by and through undersigned

counsel of record and hereby responds to court order dated May 10, 2022.  The

following response is to briefly provide a frame of reference from which to analyze

the caselaw and United States Sentencing Guidelines. The first argument relating

to U.S.S.G 3C1.1 enhancement in the PSR is that Mr. Bromley did not make a

false statement. In order to prove U.S.S.G 3C1.1 enhancement the Government

bears the burden to "*prove facts* in support of an upward adjustment by a

preponderance of the evidence." United States v. Dozier, 162 F.3d 120, 123 (D.C.

Cir. 1998). The Government would first have to offer evidence that Mr. Bromley

was asked a question, and that Mr. Bromley responded to that question falsely.

Here, the Government did not offer any evidence at all at the previous hearing, nor

did they officially advocate for the enhancement, but only offered argument to the

court. Thus, they have failed to meet their burden. <u>United States v. Dozier</u>, 162

F.3d 120, 123 (D.C. Cir. 1998). Furthermore, it is still unknown exactly what the

specific question is that Mr. Bromley supposedly answered falsely. It is yet to be

exactly quoted by US Probation or the Government. Without that information we

cannot analyze whether he answered falsely.

Secondly, as it relates the general issue of whether silence or an omission

could be grounds to apply U.S.S.G 3C1.1 in this case, I did not find any law

directly on point. However, the law I did find suggests that it does not. U.S.S.G

3C1.1 Application Note 5 (b) Examples of Conduct Not Ordinarily Covered states,

"making false statements, not under oath, to law enforcement officers, unless

application Note 4(G) applies. 4(G) relates to conduct that obstructs the

investigation of the *instant offense*. To reiterate, first Mr. Bromley didn't make a

false statement, and secondly he was already charged with disorderly conduct

when the alleged omission occurred, thus the investigation into Mr. Bromley's

disorderly conduct was not *significantly obstructed or impeded*. Also, the

Government did not offer evidence at the last hearing that their investigation of the

instant case was impeded. Furthermore, U.S.S.G 3C1.1 Application Note 2 states,

"This provision is not intended to punish a defendant for the exercise of a

constitutional right. A defendant's denial of guilt (other than a denial of guilt under

oath that constitutes perjury), refusal to admit guilt or provide information to a

probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision." Here, Mr. Bromley was interviewed before he plead guilty and still had his constitutional right to remain silent. He could choose to exercise that right at any point even mid-sentence. Attached please find *Exhibit 1*, cases for review.

RESPECTFULLY SUBMITTED,

*l/s Richard S. Jaffe*
RICHARD S. JAFFE

*l/s Michael W. Whisonant, Jr.*
MICHAEL W. WHISONANT, Jr.

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this the 23rd day of May 2022 served a copy of the foregoing by electronically filing to all parties involved.

*l/s Michael W. Whisonant, Jr.*
MICHAEL W. WHISONANT, JR.

# EXHIBIT 1

811 F.Supp.2d 359
United States District Court,
District of Columbia.

UNITED STATES of America
v.
Kevin A. RING, Defendant.

Criminal No. 08–274 (ESH).
|
Sept. 20, 2011.

**Synopsis**
**Background:** Defendant was convicted of payment of an illegal gratuity, honest services wire fraud, and conspiracy, and briefing was ordered on sentencing issues.

**Holdings:** The District Court, Ellen Segal Huvelle, J., held that:

[1] application of the sentencing guidelines cross reference for bribery was warranted;

[2] offense level enhancement for an offense involving more than one bribe was warranted;

[3] government failed to establish that benefit received or to be received in return for the payments exceeded $7 million;

[4] government failed to establish that the value of the corrupt payments exceeded $1 million;

[5] offense level enhancement for payment for the purpose of influencing an elected official was warranted; and

[6] offense level enhancement for being a manager or supervisor was warranted.

Ordered accordingly.

West Headnotes (13)

**[1]** **Sentencing and Punishment**⚖Factors or

**Purposes in General**
**Sentencing and Punishment**⚖Operation and effect of guidelines in general

A district court at sentencing begins by calculating the appropriate sentencing guidelines range, which it treats as the starting point and the initial benchmark' for sentencing; then, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the court considers all of the statutory sentencing factors and undertakes an individualized assessment based on the facts presented. 🚩18 U.S.C.A. § 3553(a); 🔖 U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

2 Cases that cite this headnote

**[2]** **Sentencing and Punishment**⚖Public officials

In defendant's sentencing for payment of an illegal gratuity, honest services wire fraud, and conspiracy, application of the sentencing guidelines cross reference for bribery was warranted, even though defendant was neither charged with nor convicted of bribery, since the government was required to prove a bribery scheme in order to obtain a conviction for honest services fraud, and the jury was specifically instructed that, on the facts of this case, the only type of scheme that the honest services fraud law forbade was a scheme to deprive the public of its right to honest services through bribery. 🚩18 U.S.C.A. § 1346; 🔖U.S.S.G. § 2C1.1, 18 U.S.C.A.; 🚩U.S.S.G. § 2C1.7(c)(4) (2003).

1 Cases that cite this headnote

**[3]** **Sentencing and Punishment**⚖Public officials
**Sentencing and Punishment**⚖Fraud and deceit

Under the bribery cross reference provision in the sentencing guideline for honest services

fraud, the sentencing court must examine a defendant's offense conduct and determine whether the offense is more specifically covered under the guideline for bribery or the guideline for honest services fraud; where a defendant's honest services scheme essentially involves bribery, then the cross-reference is appropriate, but where a defendant's scheme is comprised of multiple dissimilar acts and there is therefore more to the defendant's scheme than bribery, the cross-reference is inappropriate. ⚑ U.S.S.G. § 2C1.1, 18 U.S.C.A.; ⚑ U.S.S.G. § 2C1.7(c)(4) (2003).

**[4]**   **Sentencing and Punishment**⚬Obstructing justice and bribery

In defendant's sentencing for payment of an illegal gratuity, honest services wire fraud, and conspiracy, a sentencing guidelines offense level enhancement for an offense involving more than one bribe was warranted, even if defendant's offenses involved a single scheme to defraud, since he was charged and convicted of a scheme to defraud involving multiple public officials, and the evidence showed multiple incidents of bribery, targeted at multiple public officials. ⚑ U.S.S.G. § 2C1.1(b)(1), 18 U.S.C.A.

**[5]**   **Sentencing and Punishment**⚬Amount and degree of loss or injury

In defendant's sentencing for payment of an illegal gratuity, honest services wire fraud, and conspiracy, government failed to establish that benefit received or to be received in return for the payments exceeded $7 million, for purposes of 20-level sentencing guidelines offense level enhancement; even if defendant's lobbying clients benefited from $7.3 million increase in Department of Justice award for a jail, $4.95 million in transportation earmarks funded by House of Representatives, and $400,000 in appropriations for water project study, the government presented no evidence as to cost of the projects or amount of "benefit" they conferred on defendant's clients, and little evidence tying additional $7.3 million award for jail to any corrupt payments by defendant or his coconspirators. ⚑ U.S.S.G. § 2C1.1(b)(2)(A) (2003).

**[6]**   **Sentencing and Punishment**⚬Value of loss or benefit

For purposes of the sentencing guidelines enhancement in a bribery sentencing based on the value of the benefit received, where an individual pays a bribe on behalf of a client, the relevant value of the benefit is the net value accruing to the entity on whose behalf the individual paid the bribe; where, by contrast, there is no evidence that the payer of a bribe was acting jointly with or as an agent of a third party, a court may not consider benefit or expected benefit to the unrelated third party. ⚑ U.S.S.G. § 2C1.1(b)(2), 18 U.S.C.A.

**[7]**   **Sentencing and Punishment**⚬Value of loss or benefit

The threshold for establishing a causal connection for purposes of the sentencing guidelines enhancement in a bribery sentencing based on the value of the benefit received is low, and the government need not prove that the bribes were the "but for" cause of the benefit. ⚑ U.S.S.G. § 2C1.1(b)(2)(A) (2003).

**[8]**   **Sentencing and Punishment**⚬Amount and degree of loss or injury

In defendant's sentencing for payment of an

illegal gratuity, honest services wire fraud, and conspiracy, government failed to establish that the value of the corrupt payments exceeded $1 million, for purposes of 16-level sentencing guidelines offense level enhancement; although there was evidence of payments of $5 million spent on tickets to sports and entertainment events used by coconspirators during course of conspiracy, $500,000 expensed for meals at restaurants, $200,000 spent on travel with public officials, and corrupt payments totaling $146,000 in form of paid "little-work jobs," government admitted that not all of those expenses were necessarily corrupt, and provided no evidence in support of its estimate that between $1 million and $2.5 million of the payments were corrupt. 🚩 U.S.S.G. § 2C1.1(b)(2), 18 U.S.C.A.

**[9]    Sentencing and Punishment**⊸Obstructing justice and bribery

In defendant's sentencing for payment of an illegal gratuity, honest services wire fraud, and conspiracy, a sentencing guidelines offense level enhancement for an offense involving a payment for the purpose of influencing an elected official or any official holding a high-level decision-making position was warranted, since defendant was charged and convicted of a bribery scheme that sought to influence, among others, a United States Congressman. 🚩 U.S.S.G. § 2C1.1(b)(2)(B) (2003).

**[10]    Sentencing and Punishment**⊸Organizers, leaders, managerial role

In defendant's sentencing for payment of an illegal gratuity, honest services wire fraud, and conspiracy, a sentencing guidelines offense level enhancement for being a manager or supervisor was warranted; evidence at trial demonstrated that defendant was the so-called "Chief Operating Officer" of the lobbyists who worked

for the leader of the conspiracy, and defendant was the client manager for a number of the lobbying team's clients, and consequently signed off on expense reports detailing corrupt gifts to public officials. 🚩 U.S.S.G. § 3B1.1(b), 18 U.S.C.A.

**[11]    Sentencing and Punishment**⊸Obstruction of justice

In defendant's sentencing for payment of an illegal gratuity, honest services wire fraud, and conspiracy, a sentencing guidelines offense level enhancement for obstructing justice was not warranted; although defendant said in an interview that he did not remember much about corrupt payments to an individual in the form of a paid "little-work job," and then in a subsequent interview, he provided additional information regarding his knowledge of the payments to that individual, he provided the additional information in the later interview after having his recollection refreshed when he was shown contemporaneous emails about the individual. 🚩 U.S.S.G. § 3C1.1, 18 U.S.C.A.

**[12]    Sentencing and Punishment**⊸Obstruction of justice

A sentencing guidelines offense level enhancement for obstruction of justice is only appropriate where the defendant acts with the intent to obstruct justice; where conduct is directly and inherently obstructive, that is, where the defendant engages in behavior that a rational person would expect to obstruct justice, the court may infer an intent to obstruct justice and need not make a separate finding of specific intent. 🚩 U.S.S.G. § 3C1.1, 18 U.S.C.A.

**[13]    Sentencing and Punishment**⬦Acceptance of responsibility

In his sentencing for payment of an illegal gratuity, honest services wire fraud, and conspiracy, defendant was not entitled to a sentencing guidelines offense level reduction for acceptance of responsibility, since he ended his cooperation with the government and proceeded to trial not to make a constitutional challenge to the honest services fraud or illegal-gratuities statute, or to admit the essential elements of his conduct but challenge the applicability of the statutes to his conduct, but instead, he put the government to its burden of proof at trial by denying an essential factual element of guilt, that of his own corrupt intent to exchange things of value for official acts by public officials. U.S.S.G. § 3E1.1, 18 U.S.C.A.

**Attorneys and Law Firms**

**\*361** Richard A. Hibey, Andrew Todd Wise, Timothy Patrick O'Toole, Miller & Chevalier Chartered, Washington, DC, Matthew T. Reinhard, Anthony & Middlebrook, P.C., Grapevine, TX, for Defendant.

*MEMORANDUM OPINION*

ELLEN SEGAL HUVELLE, District Judge.

**BACKGROUND**

On September 5, 2008, a federal grand jury indicted Kevin Ring, a lobbyist who worked with Jack Abramoff, for payment of an illegal gratuity (Count II), honest

services wire fraud (Counts III, IV, V, VI, VII, and VIII), and conspiracy (Count I). A jury trial that commenced on September 1, 2009 ultimately resulted in a hung jury **\*362** on all counts.[1] A second trial commenced on October 18, 2010. Following a two-week trial and four days of deliberations, the jury returned a verdict of guilty on Counts I, II, III, VII, and VIII and a verdict of not guilty on Counts IV, V, and VI.

Before the Court is the matter of calculating the appropriate sentence for defendant under the Sentencing Guidelines. The parties' respective positions could hardly differ more dramatically. By the government's calculation, Ring's total offense level is 37, corresponding to a Guidelines sentence of 210 to 262 months.[2] Defendant, however, calculates his offense level as 16,[3] resulting in a Guidelines range of 21–27 months-a difference of approximately 17 years.

[1]  Before the Court can proceed to sentencing, it must resolve this stark conflict between the parties, for in the wake of  United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) and  Gall v. United States, 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007), a set of procedural requirements have developed that govern sentencing. "A district court begins by calculating the appropriate Guidelines range, which it treats as 'the starting point and the initial benchmark' for sentencing."  United States v. Akhigbe, 642 F.3d 1078, 1084 (D.C.Cir.2011) (quoting  Gall, 552 U.S. at 49, 128 S.Ct. 586). "Then, after giving both parties an opportunity to argue for whatever sentence they deem appropriate," the court considers all of the sentencing factors listed in  18 U.S.C. § 3553(a)[4] and undertakes "an individualized assessment based on the facts presented."  Id. (citing  Gall, 552 U.S. at 49–50, 128 S.Ct. 586).

Given the complexity of the sentencing issues that confront the Court, it ordered the parties to brief the disputed factual **\*363** and legal issues that must first be resolved, reserving briefing and argument as to the  § 3553(a) factors until after a Guidelines range had been determined. Oral argument was held on August 30, 2011.

Ring asserts that he is being penalized for exercising his Sixth Amendment right to trial, arguing that the government should be bound by the prior methodology it has consistently used for calculating the Guidelines sentences of the other Greenberg Traurig lobbyists/coconspirators who were also convicted of honest services fraud. The Court will address this issue

first, and then will turn to the host of remaining disputes regarding the calculation of defendant's Guidelines sentence, which include:

1. Whether to apply 🚩 U.S.S.G. § 2C1.7 (honest services fraud) or 🚩 § 2C1.1 (bribery) as the applicable offense of conviction.

2. Whether to apply the 2–level enhancement for offenses involving "more than one bribe." 🚩 U.S.S.G. § 2C1.1(b)(1).

3. Calculation of the "benefit received or to be received." 🚩 U.S.S.G. § 2C1.1(b)(2)(A).

4. Calculation of the "value of the payment" or "value of anything obtained or to be obtained by a public official or others acting with a public official." U.S.S.G. §§ 2C1.1(b)(2)(A) or 🚩 2C1.7(b)(1)(A).

5. Whether to apply the eight-level enhancement for offenses involving "an elected official or any official holding a high-level decision-making or sensitive position." U.S.S.G. §§ 2C1.1(b)(2)(B) and 🚩 2C1.7(b)(1)(B).

6. Whether to apply the 3–level "manager or supervisor" enhancement. 🚩 U.S.S.G. § 3B1.1.

7. Whether to apply the 2–level enhancement for obstruction of justice. 🚩 U.S.S.G. § 3C1.1.

8. Whether defendant is entitled to a 2–level reduction for acceptance of responsibility. 🚩 U.S.S.G. § 3E1.1.

## ANALYSIS

## I. VIOLATION OF THE SIXTH AMENDMENT RIGHT TO TRIAL

This prosecution arose out of the Jack Abramoff lobbying scandal that first came to light in early 2004. Between 2005 and 2009, Abramoff, along with his fellow lobbyists from Greenberg Traurig—Michael Scanlon, Neil Volz,

Todd Boulanger, and Tony Rudy—pled guilty to participating in an influence-peddling and bribery scheme whereby they provided travel, meals, tickets to sporting events, and other things of value to federal public officials, with the expectation that these officials would, in turn, perform official acts on behalf of the lobbyists' clients on an "as-needed" basis. Some of the public officials, including Ann Copland (staffer to Sen. Thad Cochran), John Albaugh (chief of staff to Rep. Ernest Istook), Mark Zachares (aide to Rep. Don Young), former Congressman Robert Ney, and William Heaton (Ney's chief of staff), also pled guilty to honest services fraud for their role in the scheme.

The Guidelines calculations for each of these defendants are detailed in Appendix A. Each of the public official defendants pled guilty to honest services fraud, and for each, the government entered into a plea agreement stipulating to an applicable base offense level under the 2003 Guidelines[5] of 10 (under 🚩 § 2C1.7) plus 8 levels for an offense involving an "elected or high-level decision-making official" (per 🚩 § 2C1.7(b)(1)(B)) for a total offense level of *364 18, prior to adjusting for role in the offense or acceptance of responsibility. In addition, Heaton and Zachares received 5K1.1 letters in recognition of their cooperation with government investigators. The government's sentencing recommendations for this group of defendants ranged from six months of home confinement (for William Heaton) to 27 months incarceration for Bob Ney, who was the only elected official charged in this conspiracy and only one of the many co-conspirators who pled but did not cooperate with the government.[6]

Each of the Greenberg Traurig lobbyist defendants (except for Scanlon and Abramoff) entered into similar plea agreements with the government, whereby Guideline 🚩 § 2C1.7 and an 8–level "elected official" enhancement was used, resulting in a total offense level of 18 prior to adjustments, including a 3–point reduction for acceptance of responsibility. Of these, only Volz has been sentenced as of this date—the government recommended a sentence "at the low end" of 4–10 months of home confinement. Without taking into account the 5K1.1 letter they are expected to receive for their cooperation, Rudy and Boulanger have agreed to Guidelines calculations that expose them to 24–30 months incarceration and 18–24 months incarceration, respectively.

Scanlon and Abramoff faced higher sentencing ranges under the Guidelines, having been convicted of multiple counts including a kickback conspiracy to defraud Abramoff's clients known as "Gimme Five." Scanlon's Guidelines range (including a 3–level reduction for

acceptance of responsibility) was 51–63 months, while Abramoff faced a range of 108–135 months. The government recommended a sentence of 24 months for Scanlon and an effective sentence of 39 months for Abramoff,[7] having given both 5K1.1 letters for their cooperation.

As Ring points out, the government now advocates for a Guidelines methodology that it has never asked for before (and that the Court has not previously employed) with respect to calculating the sentences of his co-conspirators. The government urges the Court to apply the cross reference found at ⚑ § 2C1.7(c)(4) and sentence defendant under the bribery guideline, § 2C1.1—something it has done only for Abramoff and Scanlon (who, unlike Ring, were actually charged with conspiracy to commit bribery in violation of 🔖 18 U.S.C. § 201(b)). (See Dkt. No. 257 at 2.) For each of the other co-conspirators charged with honest services fraud, the government advocated for a Guidelines calculation pursuant to ⚑ § 2C1.7.

**\*365** In addition, the government is not seeking to apply the 8–level elected-official enhancement that it applied to the other co-conspirators, including Scanlon and Abramoff.[8] Instead, it advocates for a 20–level enhancement based on the benefits received by the lobbyists' clients in exchange for the bribes provided to public officials, or in the alternative, a 16–level enhancement based on the value of the bribes paid to the public officials. (See id. at 6–19.)

Defendant's position is that the government is retaliating against him for exercising his Sixth Amendment right to trial. It is easy to see why such an inference might be justified, since the government's new methodology for calculating defendant's offense level (prior to adjustments for role in the offense and obstruction of justice) would result in a Guidelines sentence of between 121 and 151 months—nearly nine years longer than it would otherwise have been. Even assuming that the 🔖 § 2C1.1 cross reference applies, the use of the 20–level "value of benefits received" enhancement in lieu of the 8–level "elected official" enhancement translates into an eight-year difference in the ultimate sentence. Indeed, the government's position is that Ring's total offense level (37) should be the highest of all participants in the conspiracy, despite the fact that Abramoff (whose offense level was 34, not including acceptance of responsibility) and Scanlon (whose offense level was 27, not including acceptance of responsibility) were clearly more culpable.

The notion that an ostensibly objective system of

sentencing guidelines can produce such wildly varying results for essentially the same offense conduct is deeply troubling, and indeed, as Ring argues, if the Guidelines are "subject to manipulation" in this fashion, it would mock the very consistency the Guidelines were meant to impose on such elementary concepts as "offense level." (Dkt. No. 258 at 5.)

The government's first line of response is to argue that Ring is *not* similarly situated to his co-conspirators, because "he is the only lobbyist who went to trial and chose not to plead guilty and cooperate with the United States."[9] (Tr. 8/30/11 5:21–22.) Taken at face value, this position could have a noticeable chilling effect on the exercise of one's right to a jury trial. While disparities in the ultimate sentence that result from cooperation "are not unreasonable," and it is "constitutionally prop[er]" for the government to "[f]ail[ ] to afford leniency to those who have not demonstrated those attributes on which leniency is based," *United States v. Carter,* 560 F.3d 1107, 1121 (9th Cir.2009), the government cannot retaliate against defendant for exercising his rights. ⚠ *United States v. Mazzaferro,* 865 F.2d 450, 460 (1st Cir.1989). The Guidelines contain numerous provisions that account for leniency to be afforded to those who plead guilty or cooperate with the government. Prosecutors may bring fewer or different charges.[10] "Absent malfeasance, the Judiciary has nothing to say about charge bargaining **\*366** and, quite appropriately, it says nothing."[11] *Berthoff v. United States,* 140 F.Supp.2d 50, 61–62 (D.Mass.2001), *aff'd on other grounds,* 308 F.3d 124 (1st Cir.2002).[12] At sentencing, 🔖 § 3E1.1 provides for up to a 3–level reduction for defendants who clearly demonstrate acceptance of responsibility or who timely notify the government of their intention to plead guilty. The government can agree to cooperation agreements with defendants, and defendants who provide information concerning the unlawful activities of others under such agreements may be protected from having the "full" extent of their offense conduct used against them. § 1B1.8(a). Most significantly, cooperating witnesses who provide "substantial assistance" to the government may be rewarded with leniency in the form of a § 5K1.1 letter permitting the court to downwardly depart from the Guidelines.[13]

The leniency that results from such cooperation can be dramatic. Jack Abramoff's offense level prior to accounting for acceptance of responsibility under 🔖 § 3E1.1 was 34, corresponding to a Guidelines range of 151–188 months.[14] Combining the § 5K1.1 letter with the 3–level reduction for acceptance of responsibility, the government's leniency took the form of a recommended

sentence at least 112 months shorter than it would have been had Abramoff gone to trial and been found guilty, a 75 percent reduction. Neil Volz faced an offense level of 18–a Guidelines range of 27 to 33 months. The government recommended a sentence "at the low end" of the sentencing range for an offense level of 9 or approximately four months. The government's leniency toward Volz thereby reduced his sentence by at least 85 percent-again, in a manner explicitly permitted by the Guidelines.

The government's argument that it has unlimited freedom to afford "leniency" to those who plead guilty and that this does not amount to a penalty for the exercise of a defendant's constitutional right to stand trial is unpersuasive. For, as even the government admits, what it *cannot* do is "calculate the Guidelines based on whether or not someone went to trial." (Tr. 8/30/11 6:17–18.) Employing a dramatically different **367** methodology for calculating the Guidelines range of those who plead guilty would be a form of "leniency," to be sure, but arguably not permissible under the Guidelines.[15]

If accepted, the government's position would undermine the very purpose of the Guidelines, and give prosecutors even more power over sentencing than is already the case. "Congress enacted the sentencing statutes in major part to achieve greater uniformity in sentencing, *i.e.,* to increase the likelihood that offenders who engage in similar real conduct would receive similar sentences." *Booker,* 543 U.S. at 255, 125 S.Ct. 738 (Remedial Op., Breyer, J.). The Guidelines vindicate this principle in a number of ways. Judges are required and empowered to take into account not only the charges actually brought by the government, but any relevant conduct (including uncharged or acquitted conduct) occurring during the commission of the charged offense as well. U.S.S.G. § 1B1.3. In addition, the Guidelines require plea agreements to "set forth the relevant facts and circumstances of the actual offense conduct and offender characteristics," *id.* § 6B1.4(a)(1), and forbid parties from "stipulat[ing] to misleading or non-existent facts" in plea agreements, "even when both parties are willing to assume the existence of such 'facts' for purposes of the litigation." *Id.* § 6B1.4 cmt.; *accord id.* § 6B1.4(a)(2) (stipulations of fact accompanying plea agreements "shall ... not contain misleading facts"). Arguably, this system does not permit the calculation of offense levels using one methodology for defendants who plead guilty, but a dramatically different one for the "only lobbyist who went to trial and chose not to plead guilty and cooperate with the United States." (Tr. 8/30/11 5:21–22.) For to do so raises the specter that a defendant has been impermissibly retaliated against for exercising his constitutional right to stand trial.

*See* Mazzaferro, 865 F.2d at 460 ("The law is clear beyond peradventure that a sentence based on retaliation for exercising the constitutional right to stand trial is invalid."); United States v. Rolfsema, 468 F.3d 75, 79 (1st Cir.2006) ("[T]he Government may not vindictively seek to raise a defendant's sentence solely because of that defendant's exercise of a constitutional right."); Carter, 560 F.3d at 1121 (government may afford leniency to those who enter pleas "so long as there is no indication the defendant has been retaliated against for exercising a constitutional right").

But, as explained herein, the Court need not decide whether the granting leniency in this fashion represents an unconstitutional burden on defendant's right to trial by jury. Since the hearing before the Court, the government has somewhat retreated from what one might view as an absolutist position, and now argues that Ring is dissimilar from his co-conspirators "both factually and legally." (Dkt. No. 274 at 6–7.) Specifically, the government argues that between the time the plea agreements were signed with Ring's co-conspirators (late 2005 through 2009) and now, there have been significant changes both in the controlling law, *see* Skilling v. United States, —— U.S. ——, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), as well as in the relevant facts learned by the government over the course of the investigation.[16]

**368** Defendant appears to agree that a material change in the law or facts would justify a change in sentencing methodology. (*See* Tr. 8/30/11 33:17–34:3 ("[T]o the extent that the government learns new facts, ... then that might be an appropriate reasons to change the Guidelines calculation. To the extent that the government—the government learns of new authority, like Skilling that fundamentally changes the calculus, that might be an appropriate ground to vary the guideline calculation.")). Ring disagrees, however, with the suggestion that the government's prior "sentencing calculations were based on a universe of information that did not include the issues that drive its [current] position." (Dkt. No. 272 at 5.)

Ring argues that the government was free to advocate in favor of the bribery cross-reference for Albaugh, who the government argued had breached his plea agreement and whose sentence occurred post- Skilling. (Dkt. No. 258 at 2–3; Dkt. No. 274 at 5.) The fact that it did not, according to defendant, belies the government's claim that it has changed its sentencing methodology due to the Skilling decision. Likewise, Ring notes that the government did not seek to enhance Albaugh's sentence

pursuant to § 2C1.1(b)(2)(A) by referencing the total amount of appropriations sought by Ring, despite the fact that these amounts were known to the government at that time and specified in the factual basis for Albaugh's plea. (*See* Albaugh Factual Proffer ¶ 12(i).) In addition, defendant contends that the government was aware of all relevant facts at least by the time Abramoff was sentenced in August 2008, when it stated to the Court that it remained "confident that [Abramoff's] plea agreement and factual basis reflect substantially all of the fraudulent conduct which we have found Abramoff to have engaged in." *United States v. Abramoff,* 06–001 (D.D.C. Aug. 27, 2008), Dkt. No. 33 at 9.

### A. Change in Law

The first issue is simple to resolve: the law surrounding honest services fraud changed dramatically in June 2010 when the Supreme Court decided *Skilling.* (*See infra* Part II.A.) This change in the law justifies the use of the § 2C1.1 cross-reference, as well as the decision by the government to argue in favor of the 20–level "value of the benefits received" enhancement previously unavailable to it under § 2C1.7.[17]

The fact that the government did not adopt this position during Albaugh's sentencing *369 is of no moment, given that the government had agreed pre–*Skilling* to a sentencing calculation pursuant to § 2C1.7 in Albaugh's plea. Nor was the government, as Ring contends, "releas[ed] from the constraints of th[is] agreement's preliminary guidelines calculations." (Dkt. No. 272 at 5.) At sentencing, the government argued only that Albaugh failed to meet his obligations pursuant to paragraph 8(b)(ii)-(iv) of the Plea Agreement by "challenging the adequacy or sufficiency of the United States' offer of proof" against him, "den[ying] involvement in the offense," and by "giv[ing] conflicting statements about [his] involvement." (*See supra* note 17.) These actions allowed the government to oppose any adjustment for acceptance of responsibility *under the terms of the plea agreement itself.* The government at no time challenged the validity of the remainder of Albaugh's plea agreement.

### B. Change in Facts

The government's second argument is highly relevant to its decision to argue in the alternative for a 16–level enhancement for defendant based on the value of the bribes, rather than employing the 8–level elected-official enhancement it had so consistently utilized in the past. (*See supra* Part I; Attachment A). Because the Court must use the greater of the two enhancements, prior representations by the government that the 8–level elected-official enhancement applied or was "greater than any adjustment which might otherwise have applied based on value under § 2C1.7(b)(1)(A)" (*see* Albaugh Plea Agreement ¶ 8(a); Boulanger Plea Agreement ¶ 9(a)), necessarily mean that the government once believed the ascertainable value of corrupt payments in this conspiracy totaled less than $120,000.[18] *See* U.S.S.G. §§ 2C1.7(b)(1)(A) & 2B1.1(b)(1). As noted above, the government used this calculation for Ney, Heaton, Zachares, Albaugh, and *all* of the lobbyist defendants, including most notably Scanlon and Abramoff. Moreover, the government has relied on the elected-official enhancement as recently as January 2009, when it entered into a plea agreement with Todd Boulanger. Only now, after trying Mr. Ring on two occasions, does the government claim to have estimated the amount of corrupt payments, arriving at a total value exceeding $1 million. The practical effect of this change is an 8–level increase in Ring's offense level, resulting in a Guidelines range (excluding role in the offense and obstruction enhancements) that is more than six years longer than would be the case if the 8–level increase were to be applied.

The fact that the government may properly take into account new facts it has learned in the years since Ring's co-conspirators plead guilty does not mean that it may engage in *fact bargaining.* As previously explained, the Guidelines provide prosecutors with ample tools to afford leniency to those who have demonstrated the attributes on which leniency is based. *See Carter,* 560 F.3d at 1120–21. The government may not, however, mislead the court, even if it has promised a defendant it will do so as a reward for pleading guilty or for cooperation.

Our system of sentencing is in part designed to ensure that sentences are based upon "the *real conduct* that underlies the crime of conviction." *Booker,* 543 U.S. at 250, 125 S.Ct. 738 (Remedial Op., Breyer, J.). "One of the principal reasons for this, *370 as expressed by the Court, is to prevent prosecutors, when they make charging decisions, from 'exercis[ing] a power the Sentencing Act vested in judges.' " *United States v. Stewart,* 590 F.3d 93, 161 n. 13 (2d Cir.2009) (Calabresi, J. concurring)

(quoting *Booker* at 257, 125 S.Ct. 738). Plea agreements must therefore "set forth the relevant facts and circumstances of the actual offense conduct and offender characteristics" and may "not contain misleading facts." U.S.S.G. § 6B1.4(a)(1), (2). The end result is that under the Guidelines, prosecutors therefore may not "swallow the gun"—that is, "hide[ ] evidence from the sentencing judge if defendant pleads guilty but regurgitate[ ] it where the plea deal f[alls] through." *United States v. West,* 552 F.Supp.2d 74, 77 (D.Mass.2008); *accord United States v. Salazar,* 983 F.2d 778, 784 (7th Cir.1993). Even where § 1B1.8[19] applies, and the government is thereby permitted under the Guidelines to advocate for a sentence based on "facts" that do not capture a defendant's true offense conduct, "[t]his provision does not authorize the government to withhold information from the court." § 1B1.8 cmt. n. 1. Others have noted, however, that while the Guidelines may proscribe fact bargaining, they do not prevent it in practice. *See Booker,* 543 U.S. at 290, 125 S.Ct. 738 (Remedial Dissent, Scalia, J.) ("[T]he premise on which the Court's argument is based—that the guidelines as currently written prevent fact bargaining and therefore diminish prosecutorial power—is probably not correct. As one commentator has noted: '[P]rosecutors exercise nearly as much control when guidelines tie sentences to so-called 'real-offense' factors.... One might reasonably assume those factors are outside of prosecutors' control, but experience with the Federal Sentencing Guidelines suggests otherwise; when necessary, the litigants simply bargain about what facts will (and won't) form the basis for sentencing.' ") (quoting Stuntz, *Plea Bargaining and Criminal Law's Disappearing Shadow,* 117 Harv. L.Rev. 2548, 2559–2560 (2004) (omission in original).).[20]

Ultimately, however, attempting to resolve the question of precisely what facts the prosecutors knew at the time of the plea raises serious separation-of-powers and prosecutorial discretion concerns. *See, e.g., Scott,* 631 F.3d at 406–07. Moreover, such an exercise would pose challenging evidentiary issues given the number of prosecutors and defendants involved in this conspiracy. In criminal cases involving plea agreements, the Court and the probation office are frequently at the mercy of the parties to disclose and explain the relevant facts. As a result, the Court may not always get a full picture of the defendant's offense conduct, nor does it have the means to learn the information on its own.[21] Also, assuming that such a **371** delicate exercise could be conducted, and the Court could somehow determine that the government had failed to disclose relevant information in the plea agreements or sentencing memoranda of Ring's coconspirators, such a conclusion arguably would serve only to identify weaknesses in the Guidelines calculations

for *prior* sentences. *See United States v. Yeje–Cabrera,* 430 F.3d 1, 27 (1st Cir.2005) (The Guidelines "provide[ ] no justification for a court to sentence a defendant on any basis other than the facts before it, much less [do they] provide a justification for a court to disregard the facts before it as a 'remedy' for the government's earlier failure to provide all the facts.").

But, as will be clear from Part II.C, *infra,* the Court need not decide these difficult and troubling issues. First, as explained herein, the Court concludes that the 8–level enhancement for offenses involving an elected or high-level decision-making official is the correct method for determining "loss," due to the failure of the government to sustain its burden for either a 20–level "value of benefits received" enhancement or a 16–level "value of the bribes" enhancement. Second, even if the Court could validly consider disparity among convicted co-conspirators at the Guideline calculation stage, it is not necessary to do so since even the government concedes that such disparity is among the permissible factors that may be considered under 18 U.S.C. § 3553(a). (Dkt. No. 274 at 3–4.) *See United States v. Martinez,* 610 F.3d 1216, 1228 (10th Cir.2010) ("[A]lthough § 3553(a) does not require a consideration of co-defendant disparity, ... it is not improper for a district court to undertake such a comparison ....") (citations omitted); *United States v. Wills,* 476 F.3d 103, 110 (2d Cir.2007) ("Under the advisory Guidelines scheme explicated in *Booker,* it is appropriate for a district court, relying on its unique knowledge of the totality of circumstances of a crime and its participants, to impose a sentence that would better reflect the extent to which the participants in a crime are similarly (or dissimilarly) situated and tailor the sentences accordingly."); *United States v. Lazenby,* 439 F.3d 928, 934 (8th Cir.2006) (extreme disparity among co-defendants fails to serve the legislative intent reflected in § 3553(a)(6)). Thus, it is a subject that can be addressed more fully with respect to the final sentence.

Finally, the Court notes that the government could easily have avoided much of this dispute by recommending that the Court apply the Guidelines in a manner consistent with Ring's co-defendants. A remarkably similar situation arose just last month in *United States v. DiMasi.* Salvatore F. DiMasi, the former Speaker of the Massachusetts House of Representatives, was convicted earlier this year of receiving a stream of bribes and kickbacks in exchange for official acts. DiMasi's co-defendant pled guilty before trial, and in his plea agreement the government took the position that the Court should measure "value" under § 2C1.1(b)(2) by looking to the value of the bribes and

kickbacks ($915,000). In its sentencing memorandum filed just last month in DiMasi's case, the government recognized that the correct measure of "value" under the Guidelines was actually the "benefit received" in exchange for the bribes ($3,691,000). Despite this fact, the government urged the Court to use the lower value of the bribes and kickbacks "for the sake of fairness and **\*372** consistency" with his co-defendant and "to avoid unwarranted sentencing disparities ... as guided by 18 U.S.C. § 3553(a)(6)." Dkt. No. 625 at 7–8, *United States v. DiMasi,* No. 09–cr–10166 (D.Mass. Aug. 24, 2011).

Since the Court does not rely on defendant's argument that the government is bound to calculate the Guidelines range consistent with the methodology it has previously used for the coconspirators who entered pleas, it will now address the specific disputes over the calculation of defendant's Guidelines sentence.

## II. BRIBERY— § 2C1.1

### A. Application of Bribery Cross–Reference

[2] Defendant was convicted of three counts of honest services fraud (as well as one count of conspiracy to commit honest services fraud). The applicable provision under the 2003 Guidelines for honest services fraud is U.S.S.G. § 2C1.7 (Fraud Involving Deprivation of the Intangible Right to the Honest Services of Public Officials; Conspiracy to Defraud by Interference with Governmental Functions). The government argues, however, that the Court should apply the cross-reference at § 2C1.7(c)(4),[22] and thereby apply the offence guideline for bribery— § 2C1.1. The Guidelines relating to honest services fraud and to bribery are similar in a number of respects—both have a base offense level of 10, with enhancements based on the greater of 1) loss to the government, 2) the amount of the bribes or corrupt payments, or 3) whether the offense involved an elected or high-level decision-making official. *Compare* § 2C1.1(a), (b)(2) *with* § 2C1.7(a), (b)(1). The bribery provision, however, contains two significant differences: 1) an additional 2–level increase where the offense "involved more than one bribe or extortion," § 2C1.1(b)(1), and 2) the availability of an alternative enhancement based on "the value of ... the benefit received or to be received in return for the payment," § 2C1.1(b)(2)(A). For Ring, these differences are

significant: by the government's calculation, the § 2C1.1 cross-reference would increase defendant's total offense level from 31 to 37,[23] which corresponds to a nine-year increase in the Guidelines range.

Defendant contends that the cross-reference in § 2C1.7(c)(4) applies "on its face" only "to public corruption cases in which the government has charged multiple offenses in separate counts," including the scenario when "a jury convicts of honest services fraud *and* bribery." (Dkt. No. 258 at 6.) Thus, defendant argues that the cross-reference does not apply here because the government did not charge, nor did the jury convict, Ring with violating a bribery statute ( 18 U.S.C. §§ 201 or 666). (*Id.* at 6–7.) This is not how multiple offenses are accounted for by the Guidelines. Where there are multiple counts of conviction, the Court determines the base offense level, specific offense characteristics, cross references, and role adjustments for each count of conviction (including relevant conduct) separately. § 1B1.1(a)-(c). After this calculation has been made, the Court "[a]ppl[ies] Part D **\*373** of Chapter Three to group the various counts and adjust the offense level accordingly." § 1B1.1(d). Were a defendant convicted of both honest services fraud and bribery, the two offenses would in all likelihood be aggregated in accordance with § 3D1.2(d), rendering the § 2C1.7(c)(4) cross-reference unnecessary. There is simply no way to read the bribery cross-reference, which applies "[i]f the offense is covered more specifically under § 2C1.1," as being triggered based on the government's decision to charge substantive bribery in addition to honest services fraud.[24]

[3] Instead, under § 2C1.7(c)(4) the Court must examine a defendant's *offense conduct* and determine whether the offense is more specifically "covered" under § 2C1.1 (bribery) or § 2C1.7 (honest services fraud). Where a defendant's honest services scheme "essentially involve[s]" bribery, then the cross-reference is appropriate. *United States v. Hasner,* 340 F.3d 1261, 1276 (11th Cir.2003) (per curiam) (upholding application of cross-reference to § 2C1.3 (conflict of interest) where "the offenses at issue essentially involve [defendant's] failure to disclose his conflicts of interest"). Where, however, a defendant's scheme is comprised of multiple dissimilar acts and there is therefore "more to [the defendant's] scheme" than bribery, the cross-reference is inappropriate. *United States v. Jennings,* 487 F.3d 564, 588 (8th Cir.2007) (upholding district court's decision not to apply cross-reference to §

2C1.3 where defendant's offense conduct included not only nondisclosure of his conflict of interest, but also "us[ing] his position to influence his colleagues and members of the utility industry for personal gain," lying, and "fabricat[ing] documents"); *United States v. Grandmaison,* 77 F.3d 555, 567 (1st Cir.1996) (cross-reference to § 2C1.3 not applied where, in addition to failing to disclose his conflict of interest, defendant "secretly delivered gratuities to [three board members] to secure favorable votes").

Ring argues that the application of § 2C1.1 would be inconsistent with the treatment of those co-conspirators who have been charged and sentenced in connection with the same scheme to defraud. In particular, he notes that the government has not previously advocated for the use of the cross-reference for Volz, Rudy, Boulanger, Ney, Heaton, Zachares, Albaugh or Copland, either in their plea agreements or at sentencing, instead choosing to calculate the Guidelines range based on § 2C1.7.[25]

As previously alluded to, however, this inconsistency is explained by the fact that the applicable law has changed since the time that each of those co-conspirators entered their plea agreements. Ring's co-conspirators each "pleaded guilty to honest **\*374** services fraud that contemplated both bribery and undisclosed conflicts of interest." Consequently, each of these co-defendants pled guilty to "conduct that violated both bribery honest services fraud and undisclosed conflict of interest honest services fraud." (Dkt. No. 260 at 6–7.) As there was "more to these schemes" than merely bribery, the bribery cross-reference would not be applicable, leaving § 2C1.7 as the correct guideline provision.

Ring, however, went to trial after the Supreme Court's ruling in *Skilling.* That case limited the scope of honest services fraud to bribery or kickback schemes and rejected the government's argument that 18 U.S.C. § 1346 could also permissibly proscribe "undisclosed self-dealing." As a result, the government was required to prove a *bribery* scheme in order to obtain a conviction for honest services fraud, and the jury was specifically instructed that, on the facts of this case, "the only type of scheme that the honest services fraud law forbids is a scheme to deprive the public of its right to honest services through bribery."[26] *See United States v. Bryant,* 655 F.3d 232, 245–46, 2011 WL 3715811, at \*9, 2011 U.S.App. LEXIS 17753, at \*23–30 (3d Cir. Aug. 25, 2011) ("*Skilling* did not eliminate from the definition of honest services fraud any particular type of bribery, but simply eliminated honest services

fraud theories that go beyond bribery and kickbacks"); *United States v. Urciuoli,* 613 F.3d 11, 13–14, 17–18 (1st Cir.2010) (same). Ring's offense conduct therefore differs from that agreed to by his co-conspirators, in that it does not include any failure to disclose a conflict of interest. As a result, Ring's honest services fraud "essentially involved bribery," *Hasner,* 340 F.3d at 1276, and is therefore "covered more specifically under § 2C1.1." U.S.S.G. § 2C1.7(c)(4).

As a result, the Court will apply the bribery cross-reference, § 2C1.7(c)(4) and the bribery guideline in § 2C1.1 to Ring's offense conduct.

### B. Enhancement for "More than One Bribe" Under § 2C1.1(b)(1)

[4] Given the applicability of § 2C1.1, the base offense level of 10 for bribery is enhanced by 2 levels where "the offense involved more than one bribe." § 2C1.1(b)(1). The Application Notes, however, state that "[r]elated payments that, in essence, constitute a single incident of bribery or extortion (e.g., a number of installment payments for a single action) are to be treated as a single bribe or extortion, even if charged in separate counts." § 2C1.1 cmt. n. 6.

Invoking this exception, Ring argues that the multiple bribe enhancement should not apply because the government proceeded to trial on a "stream of benefits" theory, charging Ring with numerous counts that together were part of a "single scheme to defraud" the public of the honest services of public officials.

The Court rejects this argument. Section 2C1.1(b)(1) speaks not of multiple "schemes to defraud" but of multiple "bribes," and Ring was both charged and convicted of a scheme to defraud involving *multiple* public officials. This is altogether different from "a number of installment payments for a single action," and there was ample evidence at trial of multiple "incidents" of bribery, targeted at multiple **\*375** public officials.[27] *See United States v. Kahlon,* 38 F.3d 467, 470 (9th Cir.1994) (multiple "payments [that] were part of a larger conspiracy" can be the basis for an enhancement under § 2C1.1(b)(1), as long as they "were not installment payments for a single action."); *United States v. Arshad,* 239 F.3d 276, 281 (2d Cir.2001) ("Courts confronted with similar situations have uniformly held

that multiple payments meant to influence more than one action should not be merged together for purposes of § 2C1.1 merely because they share a single overall goal or are part of a larger conspiracy to enrich a particular defendant or enterprise.")

Accordingly, § 2C1.1(b)(1) should be applied, and defendant's offense level is increased by 2 levels.

**C. Calculation of "Loss" Enhancement Under § 2C1.1(b)(2)**

Section 2C1.1(b)(2) enhances the offense level for bribery based on the *greatest* of the following calculations:

(A) If the value of the payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense, whichever is greatest (i) exceeded $2,000 but did not exceed $5,000, increase by 1 level; or (ii) exceeded $5,000, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

(B) If the offense involved a payment for the purpose of influencing an elected official or any official holding a high-level decision-making or sensitive position, increase by 8 levels.

Loss calculations "need not be precise," *United States v. Antico,* 275 F.3d 245, 270 (3d Cir.2001), and the Guidelines require only that the Court "make a reasonable estimate" of these values. § 2B1.1 cmt. n. 3(C).

The government asserts that the value of the benefits received in exchange for Ring's corrupt payments was over $14 million, triggering an enhancement of 20 levels under § 2B1.1(b)(1)(H). In the alternative, the government argues that the value of the corrupt payments exceeds $1 million, triggering a 16–level enhancement under § 2B1.1(b)(1)(I). If neither of these enhancements apply, the government maintains that the 8–level "elected official" enhancement, § 2C1.1(b)(2)(B) would apply as well. Ring challenges the use of each of these enhancements.

**1. Calculation of "Benefit Received or to be Received"**

[5] The primary measure of "loss" for purposes of § 2C1.1(b)(2)(A) is the value of the "benefit received or to be received in return for the payment," as this value is typically larger than the amount of the bribe itself, and the Guidelines instruct the Court to use whichever measure of value is greatest. § 2C1.1(b)(2)(A). The government "bears the burden of supporting its loss calculation with reliable and specific evidence." *United States v. Gupta,* 463 F.3d 1182, 1200 (11th Cir.2006).

[6] "The value of 'the benefit received or to be received' means the net value of such benefit." § 2C1.1 cmt. n. 2. Thus, where a defendant pays a bribe in return for being awarded a government contract, the "value of the benefit" is the *profit* made on the contract, not the gross value of the contract. *Id.*; *United States v. Sapoznik,* 161 F.3d 1117, 1118–20 (7th Cir.1998) (Posner, J.) ("[T]he relevant 'benefit received' is indeed profit (net revenue) and **\*376** not (gross) revenue."). Furthermore, it is clear that where an individual pays a bribe on behalf of a client, the relevant "value of the benefit" is the "net value accruing to the entity on whose behalf the individual paid the bribe." *United States v. Cohen,* 171 F.3d 796, 803 (3d Cir.1999) (citing *United States v. Landers,* 68 F.3d 882, 884 (5th Cir.1995) (sales representative who paid bribe subject to enhancement based on the net value his employer derived from contracts obtained as a result of the bribe)).[28] Where, by contrast, there is no evidence that the payer of a bribe was acting jointly with or as an agent of a third party, a court may not consider benefit or expected benefit to the unrelated third party under § 2C1.1(b)(2). *See United States v. Agostino,* 132 F.3d 1183, 1197 (7th Cir.1997).

The government asserts that the value of the benefits received in exchange for Ring's corrupt payments was over $14 million. This figure includes 1) the $7.3 million increase in the Department of Justice award for the Choctaw Jail, 2) $4.95 million in transportation earmarks that were funded by the House due to Albaugh's intervention,[29] and 3) $400,000 in appropriations for a water project study assisted by Rep. John Doolittle. (Dkt. No. 257 at 10–13.) While the government's presentation of evidence at trial touched on the Choctaw jail funding, the government spent almost no time at the second trial discussing the Albaugh or Doolittle appropriations it now seeks to use in its benefit calculation. This is clearly permissible, as it is well settled that a sentencing judge may consider not only the conduct that formed the basis

U.S. v. Ring, 811 F.Supp.2d 359 (2011)

of the conviction, but also "relevant conduct." U.S.S.G. § 1B1.3(a)(2). Courts have cautioned, however, that "when the benefit calculation is based largely on conduct for which the defendant was not convicted, the district court must be careful to explain exactly how the conduct factors into the benefit calculus." United States v. Anderson, 517 F.3d 953, 963 (7th Cir.2008) (citing United States v. Schaefer, 291 F.3d 932, 938 (7th Cir.2002)).[30]

Applying this admonition, the Court cannot conclude that the government has sustained its burden of proving by a preponderance of the evidence that a 20-level enhancement is appropriate given the host of problems with these figures. First is the issue of how to determine the "net value accruing" to Ring's clients as a result of these congressional appropriations. According to the government, Ring's clients (Indian tribes and municipalities) received not cash or valuable contracts, but rather a larger jail for the Choctaw than the tribe might otherwise have built, various roads and other transportation projects, and an Army Corps of Engineers study for a future water project for Saipan in the Commonwealth of the Northern Mariana Islands *377 ("CNMI"). Determining even the gross value of these endeavors is a difficult exercise, to say nothing of the difficulty in determining what direct costs must be subtracted to determine the "net value" of these benefits. The government's position is that the net benefit is simply equivalent to the amount of the appropriation. (See Tr. 8/30/11 62–67.) But the amount of the appropriation may not necessarily represent the actual cost of these projects, let alone the "benefit" they conferred on the tribes or municipalities, and the government has failed to present any evidence in this regard. Moreover, the evidence demonstrates that the Choctaw were concerned not only with the size of the jail, but also with ensuring that the jail be constructed under a "sole source" contract, strongly implying that the profits that would flow to the Choctaw's "hand-selected construction company" represented at least some portion of the benefit it wished to derive from the jail. (Tr. 8/30/11 69:15.) Again, the government has provided no evidence as to the costs of building the jail and therefore the profits made by the sole-source construction company that built it.

[7] The second major issue with the government's chosen "amount of the benefit received" figures is the attenuated, if not nonexistent, causal link between these appropriations and corrupt lobbying. As the government correctly notes, the "threshold for establishing a causal connection under § 2C1.1(b)(2)(A) is low," United States v. McNair, 605 F.3d 1152, 1230 (11th Cir.2010), and the government need not prove that the bribes were

the "but for" cause of the benefit.[31] Id.; Sapoznik, 161 F.3d at 1118–19 (government need only show that the bribes "facilitated" the benefit); United States v. Kinter, 235 F.3d 192, 198 (4th Cir.2000) ("The threshold for the causation inquiry for § 2C1.1 calculations is relatively low."); Cohen, 171 F.3d at 804 (rejecting "but for" causation under analogous commercial bribery Guideline § 2B4 1.1(b)(1)).

"[T]he question of causation is different," however, "from the question of quantification." Sapoznik, 161 F.3d at 1119 (emphasis added). The government has presented little to no evidence tying the additional $7.3 million award for the Choctaw jail to any corrupt payments by Ring or his co-conspirators.[32] While the government has presented evidence suggesting that David Ayres, Attorney General John Ashcroft's chief of staff, received a ticket to March Madness approximately a month after the $16.3 million was awarded for the Choctaw jail (see GX KR 327 ("glad he got a chance to relax, now he can pay us back")), there is no evidence connecting this ticket with the decision to award the additional funding for the jail. To respond to this problem, the government concedes that this exchange most likely relates to the "resistance from the DOJ bureaucrats and the 'red tape' that held up the no-bid contract" for building the jail. (Dkt. No. 260 at 14.) The "net benefit" received by the Choctaw might therefore be the difference between a no-bid contract and a competitive contract—and yet, there is no evidence upon which the Court could make such a calculation, nor is there a scintilla of evidence relating to what role, if any, Ayres played in this decision, thereby making it impossible to infer that the March Madness ticket was intended as a *378 bribe, as opposed to an illegal gratuity or merely an attempt to build goodwill.

The government's theory appears to be premised on aggregating the value of any appropriations that can be directly traced to Kevin Ring's lobbying efforts. But in determining the value of the benefits "received or to be received in return for the payment," the Court must take care to take into account benefits that would have been received in any event. United States v. Whitfield, 590 F.3d 325, 368 (5th Cir.2009) (where trial judge bribed by an attorney, intended loss under § 2C1.1(b)(2) is not the amount of the verdict, but rather must be "adjusted by taking into account a reasonable estimate of whatever intrinsic value that case may have had if litigated before an impartial judge"). Similarly, the benefits Ring's clients received from his corrupt lobbying must be compared with what might have happened had

there been no *corrupt* lobbying, not, as the government would have it, by looking to what would have happened had there been no lobbying at all. (*See* Dkt. No. 260 at 10–14.) This is particularly true given the government's necessary concession that only some portion of Ring's lobbying was corrupt or improper. (*See, e.g.,* Dkt. No. 257 at 18.)

Finally, and most importantly, the government has made no effort to distinguish between bribes and gratuities when discussing the corrupt payments it claims are connected to benefits to Ring's clients. The distinction is important. Bribery requires the corrupt intent to exchange things of value for official acts, while an illegal gratuity need only be given "for or because of" an official act. The Guidelines reflect this distinction not only with different base offense levels for bribery (10) and illegal gratuities (7), but also by allowing for an enhancement based on "benefit received or to be received" under 🚩 § 2C1.1 (bribery), but *not* under § 2C1.2 (illegal gratuities). Consequently, benefits received in connection with an illegal gratuity cannot serve as the basis for a "value of the benefit" enhancement under 🚩 § 2C1.1(b)(2)(A), but the government has never attempted to distinguish the two, choosing instead to merely lump them together under the heading of "corrupt payments."[33]

The Court therefore determines that it cannot arrive at a reasonable estimate of the "value received or to be received" in return for the bribes paid by defendant.

### 2. Calculation of Bribe Value

[8] An alternative method of calculating the 🚩 § 2C1.1(b)(2) enhancement is by determining the value of the corrupt payments themselves. For this calculation, the government lists three types of corrupt payments: $5 million spent on tickets to sports and entertainment events at the MCI Center, FedEx Field, and baseball games used by the co-conspirators during the course of the conspiracy; $500,000 expensed for meals at restaurants (including Signatures, which was owned by Abramoff); $200,000 spent on travel with public officials; and corrupt payments to Julie Doolittle ($96,000) and Lisa Rudy ($50,000) in the form of paid "little-work jobs." (Dkt. No. 15–19.)

To begin with, the government's figure for the value of the tickets is clearly too high. As the government notes (Dkt. No. 257 at 17 n. 7), this Court held during Coughlin's sentencing that the "value" of these tickets is

their face (or fair market) **\*379** value, and not the per-person, per-event share of the cost to Greenberg Traurig for leasing the suite. Sentencing Hearing, *United States v. Coughlin,* No. 08–cr–111 (D.D.C. Nov. 24, 2009).[34] As previously noted at the *Coughlin* Sentencing, this is the same formulation employed by the Internal Revenue Code, which uses the face value of non-luxury tickets to define the business expense deduction allowed for a luxury skybox. *See* 🚩 I.R.C. § 274(*l* )(2) ("In the case of a skybox or other private luxury box leased for more than 1 event, the amount allowable as a deduction under this chapter with respect to such events shall not exceed the sum of the face value of non-luxury box seat tickets for the seats in such box covered by the lease.") In addition, the government's proposed ticket value assumes incorrectly that ticket recipients received a *pro rata* share of the full value of the suite. But such recipients did not benefit from the many perks associated with owning or leasing an entire luxury box. When calculating the value of an in-kind bribe, courts have held the appropriate "value" to employ is value to the *recipient* of the bribe, not the cost to the one who pays the bribe.[35] *United States v. Bohuchot,* 625 F.3d 892, 904–05 (5th Cir.2010) (evaluating value of bribe as the value "received" by the bribed official). The alternative would lead to nonsensical results, for example, by allowing an individual who bribes another by giving him a rare signed baseball card worth $50,000 to defend himself by claiming that the "value of the bribe" is merely the 10 cents he paid for it at a garage sale. Additionally, the Court notes that the trial testimony of Agent LoStrocco that the government now relies upon indicates that the total cost of the tickets was $4.6 million, not $5 million. (*See* Tr. 11/1/10 AM 78:18–87:25.)

Even setting these issues aside, there is much more fundamental flaw with the government's calculations. The government freely admits that not all of these expenses were necessarily corrupt (Dkt. No. 257 at 17), but it also resists any attempt to define what exactly is a corrupt payment. (*See, e.g.,* Tr. 8/30/11 73–92.)[36] For instance, **\*380** the $5 million allegedly spent on tickets included not only corrupt gifts, but also in-kind campaign contributions (typically in the form of fundraisers held at box suites); attendance by family, friends, business associates, or the lobbyists themselves; as well as non-corrupt lobbying, cultivation of personal and political relationships, and building a reservoir of goodwill with public officials. Similarly, while the government has provided the total cost of trips to the Super Bowl, Scotland, and Puerto Rico, they make no attempt to subtract the costs associated with the non-public officials who went on these trips, including friends, family, and the lobbyists themselves. (*See* Tr. 8/30/11 84–85.) The government also concedes that the Court must subtract the

fair market value of the work done by Julie Doolittle and Lisa Rudy from the payments made to them. (Tr. 8/30/11 87:20–88:4.) But instead of attempting to calculate an evidence-based estimate of what proportion of these things of value were in fact corrupt, the government merely states that "there is not an easy way to calculate what portion of the tickets and expenses were actually used for corrupt purposes" and speculates that it "believes that a range of between $1 million and $2.5 million is appropriate." (Dkt. No. 257 at 19.) When asked to justify this figure, the government merely stated that it represented "less than 20% of the potential corrupt payments," without providing any evidence whatsoever to support its selection of this arbitrary discount factor. (Dkt. No. 260 at 17–19.)

This is unacceptable. The Court is mindful that loss calculations "need not be precise," 🚩 *Antico,* 275 F.3d at 270, and the Guidelines require only that the Court "make a reasonable estimate" of these values. 🚩 § 2B1.1 cmt. n. 3(C). But the government "bears the burden of supporting its loss calculation with reliable and specific evidence," and it may not simply guess where such evidence is unavailable. 🚩 *Gupta,* 463 F.3d at 1200 (While "generally a district court's 'reasonable estimate of the intended loss will be upheld on appeal' ... such calculation may not be mere speculation.") (quoting 🚩 *United States v. Renick,* 273 F.3d 1009, 1025 (11th Cir.2001)); *United States v. Cuti,* No. 08–cr–972, 2011 WL 3585988, at *4, 2011 U.S. Dist. LEXIS 84791, at *12–13 (S.D.N.Y. July 29, 2011) (while the court "need only make a reasonable estimate of the loss, given the available information," it "may not engage ... in 'pure speculation.' " (internal citation omitted); 🚩 *United States v. Deutsch,* 987 F.2d 878, 886 (2d Cir.1993)).

Moreover, the government's reliance on 🚩 *United States v. Bras,* 483 F.3d 103 (D.C.Cir.2007), is misplaced. (*See* Tr. 8/30/11 78:23–24.) While *Bras* held that a district court "need only make a reasonable estimate of the loss, given the available information," 🚩 *Bras,* 483 F.3d at 112, a closer look at the facts of that case reveal the extent of the deficiencies in the government's approach here. Bras pled guilty mid-trial to overcharging the D.C. Department of Public Works for asphalt used to pave the District streets. Prior to sentencing, the district court conducted a two-day evidentiary hearing to determine "loss to the government" from Bras's scheme. The government employed the following methodology:

For each day that Fort Meyer delivered asphalt to a DPW site, a Fort Meyer **\*381** foreman would prepare a Daily Report listing the actual amount of asphalt delivered to a particular location. (These should not be confused with the IDRs—the daily reports prepared by DPW inspectors that included the weights from the false tickets.) Because it was impossible to tell from the face of an asphalt ticket whether it was false, [the government] compared the asphalt totals in the Daily Reports with the totals reflected on the asphalt tickets for the same date, contract, and location. When the tickets reflected a greater amount of asphalt than the Daily Report, thus indicating a fraudulent overstatement, she calculated the difference in tons and multiplied that amount by the appropriate price per ton to determine the loss.

🚩 *Id.* at 110. At the district court's request, the government went further and recalculated the loss by excluding any items insufficiently supported by documentary evidence. 🚩 *Id.* at 110–11. Here, by contrast, the government seeks to increase Ring's Guidelines range by nearly four years (prior to taking offense role and obstruction into account) by applying an admittedly arbitrary discount factor to an admittedly inflated gross total. Such a cavalier approach cannot be squared with the government's burden of having to prove a "reasonable estimate" of the value of the corrupt payments, and, therefore, the Court concludes that it cannot reasonably determine the value of the corrupt payments pursuant to 🚩 § 2C1.1(b)(2)(A).

### 3. Elected or High-level Official Enhancement

[9] Given that the Court cannot reasonably determine either the value of the corrupt payments or the benefit received or to be received in return for corrupt payments under 🚩 § 2C1.1(b)(2)(A), it will turn to the "elected or high-level decision-making official" enhancement. This provision provides an eight-level enhancement where "the

offense involved a payment for the purpose of influencing an elected official or any official holding a high-level decision-making or sensitive position." § 2C1.1(b)(2)(B).

Ring argues that a similar provision— § 2C1.7(b)(1)(B)—would not apply to the facts of this case, were the Court to apply § 2C1.7 instead of § 2C1.1. (*See supra* Part II.A.) Specifically, Ring argues that under this provision (which applies where the offense "involved" an elected or high-level decision-making official), the elected or high-level decision-making official must be a participant in the scheme, and "the eight-point enhancement is reserved for schemes that include a high-level or elected official within its group of involved actors." (Dkt. No. 258 at 20–21.)[37]

Given that the Court is not applying § 2C1.7, it is unclear whether Ring similarly objects to the use of § 2C1.1(b)(2)(B). Any such objection would be misplaced, however, as § 2C1.1(b)(2)(B) explicitly applies where the "payment" is "for the purpose of influencing" an elected official. Ring was charged and convicted of a bribery scheme that sought to influence, *inter* **\*382** *alia,* Congressman John Doolittle, and therefore the § 2C1.1(b)(2)(B) enhancement applies to defendant's offense conduct. (*See* Dkt. No. 258 at 20–21 (implying that such a formulation would capture defendant's conduct).)

## III. ENHANCEMENTS

### A. Manager or Supervisor Enhancement

[10] The government argues that Ring's sentence should be enhanced pursuant to § 3B1.1(b), which increases the offense level by 3 levels where "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." The Application Notes to this section comment that factors "the court should consider include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others" in applying

this provision. § 3B1.1 cmt. n. 4.

While admitting to a managerial or supervisory role within the overall lobbying practice at Greenberg Traurig (Dkt. No. 258 at 23–24), Ring argues that the evidence was insufficient to demonstrate a managerial or supervisory role over the *criminal* lobbying activity.

The evidence at trial, however, demonstrated that Ring was the so-called "Chief Operating Officer" of the lobbyists who worked for Jack Abramoff. (Tr. 10/25/10 a.m. 56:8–19.) Ring was the client manager for a number of the lobbying team's clients, including the Choctaw, E–Lottery, and the CNMI, and consequently signed off on the expense reports detailing the corrupt gifts to public officials by Neil Volz and Todd Boulanger. (Tr. 10/28/10 p.m. 62:24–63:18.) In addition, the government charges that Ring cultivated a number of public officials (including Robert Coughlin, David Lopez, and Jennifer Farley) as "champions," thereby recruiting them into the conspiracy. (*See* Dkt. No. 257 at 22; Tr. 10/28/10 p.m. 32:20–33:18.)

Ring's argues that the government's "theory that a team of young lobbyists learned corrupt lobbying from Jack Abramoff" is inconsistent with its suggestion today that Ring was a manager or organizer of the criminal activity of others. (Dkt. No. 258 at 25.) Abramoff received a 4–level enhancement in consideration of his role as the "organizer or leader" of the conspiracy. But this fact in no way precludes the Court from enhancing defendant's offense level based on the lower "manager or supervisor" provision. Indeed, "there can be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." § 3B1.1 cmt. n. 4.

Based on the evidence presented at trial, the Court concludes that Ring had an "active supervisory role in the actual criminal conduct of others," *United States v. DeGovanni,* 104 F.3d 43, 46 (3d Cir.1997), and therefore, he qualifies for the 3–level "manager or supervisor" enhancement.

### B. Obstruction of Justice

[11] The government asserts that Ring's sentence should be enhanced for obstructing justice, pursuant to § 3C1.1, which states:

> If: (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any **\*383** relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

Application Note 4 to 🚩 § 3C1.1 sets forth a non-exhaustive list of "examples of the types of conduct to which this adjustment applies," which includes "other conduct prohibited by obstruction of justice provisions under Title 18, United States Code." 🚩 § 3C1.1 cmt. n. 4(i).

The government charges that Ring made false statements to Henry Schuelke and another private attorney and investigators hired by Greenberg Traurig, and that these statements are sufficient to prove, by a preponderance of the evidence, that Ring intended to obstruct justice. Specifically, the government points to Ring's "false and misleading statements about his knowledge of and participation in the [Michael] Scanlon–Abramoff kickback scheme, his receipt of $135,000 related to the Sandia Pueblo [tribe], as well as his knowledge [of] the corruption scheme involving payments to Julie Doolittle for a little-work job." (Dkt. No. 257 at 25.)

Ring admittedly made false statements to Schuelke regarding his knowledge of the Abramoff–Scanlon "Gimme Five" kickback scheme and the circumstances surrounding his receipt of $135,000 from Abramoff and Scanlon. (*See* GX–OKR 184, 185.) Even if the Court were to assume, however, that Ring's actions "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice," 🚩 § 3C1.1(A), the obstruction enhancement is not triggered unless Ring's obstructive conduct "related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense." 🚩 § 3C1.1(B). As the Court has previously held, the Scanlon–Abramoff kickback scheme (and Ring's receipt of $135,000 in connection with these kickbacks) is not the same scheme or transaction as the public corruption scheme Ring was tried and convicted of. Indeed, it was for this very reason that the Court severed Counts IX and X, which charged defendant with

obstruction of justice based on this same conduct. (*See* Tr. 6/26/09 64:20–21 ("it's not the same scheme or transaction"); *id.* 65:1–2, 10–11 ("I think it's completely unrelated to what this case is about .... whether or not the billings of Greenberg Traurig were fair, not fair, true, not true ... has nothing to do with honest services.")) Indeed, the government now concedes that "Ring's false and misleading statements about his receipt of kickbacks may not be best handled under the 🚩 § 3C1.1 obstruction enhancement." (Dkt. No. 274 at 5.)

By contrast, had Ring obstructed justice by lying about the "little-work job" for Julie Doolittle, such conduct obviously would relate to the offense of conviction since Ring's conviction on Count VIII involved a wire transfer of monies to Julie Doolittle. Here, however, the government has not met its burden of proving obstruction.

[12] "An enhancement under 🚩 § 3C1.1 'is only appropriate where the defendant acts with the intent to obstruct justice.' Where conduct is 'directly and inherently obstructive'—that is, where the defendant engages in 'behavior that a rational person would expect to obstruct justice'—the court may infer an intent to obstruct justice and need not make a separate finding of specific intent.'' *United States v. Reeves,* 586 F.3d 20, 23 (D.C.Cir.2009) (quoting *United States v. Henry,* 557 F.3d 642, 646, (D.C.Cir.2009)). The government asserts that Ring obstructed justice by "deny [ing] [that he] remember[ed] much about the corrupt job for Julie Doolittle" during the fourth interview with Schuelke (Dkt. No. 257 at 26), as demonstrated by the fact that during the fifth interview, "Ring provided additional information regarding **\*384** his knowledge of the payments to Julie Doolittle and that, unlike what he had said in previous interviews, he had spoken with David Lopez about his concerns." (*Id.*) What the government omits, however, is that Ring was shown a series of emails about David Lopez and Julie Doolittle immediately prior to his being questioned about this issue during the fifth interview. (GX–OKR 185 at 19.) The fact that Ring "changed" his story when asked about the Julie Doolittle job from "I don't remember, I need my recollection refreshed" to later providing additional details after having his recollection refreshed with contemporaneous emails is plainly not "directly and inherently obstructive" and is insufficient to demonstrate that Ring lied to Schuelke about this issue or intended to obstruct justice. *See* 🚩 § 3C1.1 cmt. n. 2 (distinguishing "faulty memory" from a "willful attempt to obstruct justice"). Indeed, the government essentially recognized the weakness of this "falsehood" at oral argument:

[T]he job for Julie Doolittle in terms of the false and misleading statements is not nearly as strong as the false and misleading statements for the kickback that he received. The government has never put forth that it is as strong, and it is unlikely that it would have been included as a stand-alone charge.

(Tr. 8/30/11 122:13–19.) Since Ring's lack of memory as to Julie Doolittle "stand[s] alone," and it does not constitute obstruction of justice, the Court will not apply the 🚩 § 3C1.1 enhancement.

## IV. ACCEPTANCE OF RESPONSIBILITY

[13] Finally, Ring argues that the Court should grant a 2–level reduction under 🚩 § 3E1.1 for acceptance of responsibility, notwithstanding the fact that he has gone to trial and been convicted. While "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse," a defendant's conviction at trial "does not automatically preclude a defendant from consideration for such a reduction." 🚩 § 3E1.1 cmt. n. 2. "[W]here a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.,* to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)," the defendant may, in rare circumstances, still be able to clearly demonstrate an acceptance of responsibility for his criminal conduct sufficient to trigger application of this

provision. *Id.* Ring asserts that this is just such a case, and that his "comprehensive cooperation" during thirteen meetings with prosecutors and agents over a period of fourteen months and his "complete candor" during these meetings evidences his acceptance of responsibility. (Dkt. No. 258 at 41.)

The Court disagrees. Ring did not end his cooperation and proceed to trial "to make a 'constitutional challenge'" to the honest services fraud or illegal-gratuities statute, or to admit the essential elements of his conduct, but "challenge the applicability" of these statutes to his conduct. *See* 🚩 § 3E1.1 cmt. n. 2. Nor is it accurate to conclude that, as Ring argues, his "cooperation with the government ended because he refused to adopt the government's *legal* theory." (Dkt. No. 258 at 41 (emphasis added).) Rather, Ring "put the government to its burden of proof at trial by denying [an] essential *factual* element[ ] of guilt": his own corrupt intent to exchange things of value for official acts by public officials." 🚩 § 3E1.1 cmt. n. 2.

The Court therefore denies Ring's request for an acceptance-of-responsibility reduction under 🚩 § 3E1.1.

### *385 CONCLUSION

For the foregoing reasons, the Court's calculation of defendant's Guidelines range is as follows:

### Base Offense Level

| | | |
|---|---|---|
| Offering or Giving a Bribe | 2C1.1(a) | 10 |

*Specific Offense Characteristics*

| | | |
|---|---|---|
| More Than One Bribe | 2C1.1(b)(1) | +2 |
| Elected or High–Level Decision–Making Official | 2C1.1(b)(2)(B) | +8 |

*Aggravating Role in the Offense*

| | | |
|---|---|---|
| Manager or Supervisor | 3B1.1(b) | +3 |

| | | |
|---|---|---|
| TOTAL | | 23 |
| Guidelines Range | | 46–57 months |

**\*386 APPENDIX A**

APPENDIX A

Co-conspirator plea agreements (with final government recommendation at sentencing and ultimate sentence imposed by Court). All references are to the 2003 Guidelines Manual.

**Public Official Co-Conspirators Who Pled to Honest-Services Fraud**

| Defendant | Date of Plea | Offense(s) | Guideline (Base Offense Level) | Honest-Services/Bribery Enhancements | Adjustments | Total Offense Level | Government Recommendation | Court's Sentence |
|---|---|---|---|---|---|---|---|---|
| Robert Ney | 9/15/06 | Honest-Services Fraud, False Statement, Employment Restrictions | §2C1.7 (10) and §2C1.3 (6) | +8 (Elected Official) | +2 or +3 (Role in the Offense) -3 (Acceptance of Responsibility) | 17 or 18 (24-30 months or 27-33 months) | 27 months (argued in favor of +3 "Role in the Offense" enhancement) | 30 months incarceration |
| William Heaton | 2/26/07 | Honest-Services Fraud | §2C1.7 (10) | +8 (Elected Official) | -3 (Acceptance of Responsibility) | 15 (18-24 months) | "Low end" of 6-12 month range with home confinement (5K1.1 letter requested; 3-level reduction) | 48 months probation |
| Mark Zachares | 4/24/07 | Honest-Services Fraud | §2C1.7 (10) | +8 (Elected Official) | -3 (Acceptance of Responsibility) | 15 (18-24 months) | 12-18 months (5K1.1 letter requested; 2-level reduction) | 48 months probation (with home confinement; 24 days in jail on weekends) |
| John Albaugh | 6/2/08 | Honest-Services Fraud | §2C1.7 (10) | +8 (Elected Official; "greater than any adjustment ... based on value of [bribes]") | -2 (Acceptance of Responsibility) | 16 (21-27 months) | 27 months (Objected to 2-level reduction for Acceptance of Responsibility) | 60 months probation (4 months in halfway house) |
| Ann Copland | 3/16/09 | Honest-Services Fraud | §2C1.7 (10) | +8 (Elected Official; "value of bribe 'exceeds $10,000 but is less than $30,000'") | -2 (Acceptance of Responsibility) | 12 (10-16 months) | 10 to 16 months | 18 months probation (75 days halfway house, 75 days home detention) |

**Greenberg Traurig Lobbyist Co-Conspirators Who Pled to Honest-Services Fraud**

| Defendant | Date of Plea | Offense(s) | Guideline (Base Offense Level) | Honest-Services/Bribery Enhancements | Adjustments | Total Offense Level | Government Recommendation | Court's Sentence |
|---|---|---|---|---|---|---|---|---|
| Michael Scanlon | 11/21/05 | Bribery, Fraud, Honest-Services Fraud | §2C1.1 (10) for "Corruption Offenses" §2B1.1 (6) for "Fraud Offenses" | +2 (More Than One Bribe) +8 (Elected Official) | +1 (Multiple Counts) -3 (Acceptance of Responsibility) | 24* (51-63 months) | 24 months (5K1.1 letter) | 20 months incarceration |
| Jack Abramoff | 1/3/06 | Bribery, Fraud, Honest-Services Fraud, Tax Evasion, Employment Restrictions | §2C1.1 (10) for "Corruption Offenses" §2B1.1 (6) for "Fraud Offenses" §T4.1 (22) for "Tax Offenses" | +2 (More Than One Bribe) +8 (Elected Official) | +4 (Role in the Offense) +1 (Multiple Counts) -3 (Acceptance of Responsibility) | 31* (108-135 months) | 39 months (5K1.1 letter requested 6-level reduction and credit for time served for cooperation in S.D. Fla.) | 48 months incarceration |
| Neil Volz | 5/8/06 | Honest-Services Fraud, Employment Restrictions | §2C1.7 (10) for Honest-Services Fraud §2C1.3 (6) for Employment Restrictions | +8 (Elected Official) | -3 (Acceptance of Responsibility) | 15 (18-24 months) | "low end" of 6-30 months, with home confinement (5K1.1 letter requested 6-level reduction) | 24 months probation |
| Tony Rudy | 3/31/06 | Mail & Wire Fraud, Honest-Services Fraud, Employment Restrictions | §2C1.7 (10) for Honest-Services Fraud §2B1.1 (6) for Mail & Wire Fraud §2C1.3 (6) for Employment Restrictions | +8 (Elected Official) | +2 (Multiple Counts) -3 (Acceptance of Responsibility) | 17 (24-30 months) | Plea Agreement includes potential for 5K1.1 letter | Not yet sentenced |
| Todd Boulanger | 1/30/09 | Honest-Services Fraud | §2C1.7 (10) | +8 (Elected Official; there may be any adjustment ... based on "role") | +4 (Acceptance of Responsibility) | 15 (18-24 months) | Plea Agreement includes potential for 5K1.1 letter | Not yet sentenced |
| Kevin Ring (Government's current position re: Guidelines) | N/A | Illegal Gratuities, Honest-Services Fraud | §2C1.1 (10) | +2 (More Than One Bribe) +20 (Benefit received or obtained in exchange for bribes between $7mm and $20mm) | +3 (Role in the Offense) +2 (Obstruction of Justice) | 37 (210 to 262 months) | 210 to 262 months | |

*Scanlon and Abramoff's total offense level driven by §2B1.1, which related to the fraud on the Indian tribes. This resulted in an offense level of 26 for Scanlon (due to $7 million to $20 million loss to tribes) and 32 for Abramoff (due to $25 million loss to the tribes).

## All Citations

811 F.Supp.2d 359

**\*387**

## Footnotes

[1]     Because seven of the eight counts involved violations of the honest services wire fraud statute, 18 U.S.C. § 1346, the Court continued the retrial pending the Supreme Court's decision in *Skilling v. United States,* —— U.S. ——, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), which was handed down on June 24, 2010.

[2]     Everyone agrees that defendant's criminal history category is I.

[3]     Although Ring has advocated against the use of the 8–level "public official" enhancement, he appears to ultimately concede that this objection is secondary to his "core position" in favor of consistency between similarly-situated co-conspirators. (Dkt. No. 272 at 14.)

[4]     Section 3553(a) states in pertinent part:

     The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

...

(5) any pertinent policy statement—

...

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

[5]    The D.C. Circuit has held that under the principles articulated in *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), application of post-offense versions of the Guidelines violates the Ex Post Facto Clause if the subsequent revisions increase a defendant's sentencing range. *United States v. Turner,* 548 F.3d 1094, 1099–1100 (D.C.Cir.2008). Because defendant's sentencing range under the Guidelines would be higher under the current version of the Guidelines Manual, the Court agrees with the parties that the 2003 version must apply. Accordingly, all references to the Sentencing Guidelines are to the 2003 Manual, unless otherwise noted.

[6]    In addition to those defendants who appear in Appendix A, others involved in the Abramoff scandal who pled guilty include Robert Coughlin (illegal gratuities), James Griles (obstruction of justice), Italia Federici (obstruction of justice and tax evasion), and Horace Cooper (misdemeanor making and using a false certificate or writing). In addition, Fraser Verrusio was found guilty by a jury for illegal gratuities and false statements, and David Safavian was found guilty by a jury for false statements and obstruction of justice.

[7]    While the government technically requested that the Court impose a sentence of 64 months for Abramoff, it requested that this sentence run concurrently with the sentence previously imposed by the Southern District of Florida in a manner that gave him credit for time already served on that sentence. *See* Sentencing Hearing at Tr.

30:13–31:6, *United States v. Abramoff,* No. 06–cr–001 (D.D.C. Sept. 4, 2008).

8   The one exception is Ann Copland, for whom the elected or high-level decision-making official enhancement did not apply.

9   The government made this point repeatedly at oral argument. (*See, e.g.,* Tr. 8/30/11 9:20–10:2 ("And while there's an argument to be made that they are similarly situated because they engaged in similar factual conduct, ... they are not similarly situated in that they chose to proceed to trial. Mr. Ring chose to proceed to trial, expend government resources, the court's resources and the public's resources and therefore is not similarly situated to others who pled guilty early on in the investigation.").)

10  As the government has noted, Ring differs from his co-conspirators in that he was convicted of both honest services fraud and illegal gratuities (as well as conspiracy to commit both crimes). (*See* Dkt. No. 274 at 7.) This fact has no impact on the Guidelines calculations for defendant, however, because the Court agrees with the parties that the honest services counts (Counts III, VII, VIII and the honest services fraud overt act of Count I) are properly grouped together with the illegal gratuities counts (Count II and the illegal gratuities overt act of Count I) pursuant to § 3D1.2(d). Accordingly, the offense level for these counts is determined by "the offense guidelines that produces the highest offense level," which is § 2C1.1. § 3D1.3(b).

11  For example, the government permitted Robert Coughlin to plead to violating 18 U.S.C. § 208, conflict of interest involving a personal financial interest, as opposed to honest services fraud, even though the Wizards tickets received by Coughlin were charged in the Ring indictment both as an illegal gratuity (Count II) and as honest services fraud (Count III). As the conflict of interest involved a gratuity, Coughlin was sentenced pursuant to § 2C1.2 (illegal gratuity), which has a lower base level (7) than either § 2C1.1 or § 2C1.7 (both of which have a base level of 10).

12  Thus, it may very well be that the Court cannot take into account the fact that although the government has relied heavily on evidence that implicates several Congressmen other than Ney, it has not charged any of them in connection with this conspiracy. *See United States v. Scott,* 631 F.3d 401, 406–07 (7th Cir.2011) (affirming district court's refusal to consider the lack of charges against co-conspirators).

13  Similarly, the government is free to ask for a below-Guidelines variance based on the § 3553(a) sentencing factors.

14  Abramoff's offense level was driven primarily by the fraud and tax evasion charges against him rather than by the public corruption offenses. (*See* Appendix A at 2.)

15    For example, in 🚩 *Carter,* which the government relies upon (*see* Dkt. No. 260 at 3), the 9th Circuit rejected a defendant's claim of unwarranted disparity in the *ultimate sentence,* not in the fundamental methodology used to calculate the Guidelines range. 🚩 560 F.3d at 1121.

16    The government's additional justifications for altering its Guidelines methodology are unavailing. (*See* Dkt. No 274 at 6–7.) As noted herein, the fact that "Ring was convicted of more and different charges" than his co-conspirators plays no role in calculating the Guidelines range. (*See supra* note 10.) Furthermore, the fact that the government is limited by contract principles from revising its sentencing position with regard to Ring's co-conspirators is beside the point—the only issue is what the government knew and the positions it took at the time it entered into the plea agreements, not at the time of sentencing.

17    Even if the government had previously applied 🚩 § 2C1.1 to Albaugh, it remains unclear whether it would have been able to use the "Conference Hopes and Demands" appropriations to enhance his sentence as "benefits received" in exchange for bribes. (*See* Albaugh Factual Proffer ¶ 12(i) (quoting GX KR 158).) The government maintains that at the time Albaugh pled guilty, it "did not yet understand" that these four requests "would have been eliminated but for the relationship with Mr. Ring." (Tr. 8/30/11 13:2–4.) It bears noting, however, that after the first trial, Albaugh "recanted" his testimony regarding causation and told the government that he "believed that the role of the meals and tickets in his assistance to Mr. Ring was less than what he had previously testified" and that "that if Mr. Ring had provided only campaign contributions and not the meals and tickets, that he likely would have taken the same official actions." (Dkt. No. 187 at Ex. A.) As a result, he did not appear as a witness at the second trial, and at his sentencing, the government argued against granting him any reduction for acceptance of responsibility.

18    Despite the fact that the government alleges that Boulanger, Rudy, Volz, and Ring were all Greenberg Traurig lobbyists involved in the same conspiracy to corrupt public officials, it made no effort to aggregate the things of value given to public officials by Boulanger Volz, or Rudy, reserving such a calculation for Ring alone. (*See* Attachment A.)

19    "Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable Guidelines range, except to the extent provided in the agreement."

20    To be clear, the prosecutors do not concede that they "swallowed the bribes," but rather they assert that, when they entered into plea agreements with Ring's co-defenders as early as 2005, they did not have a complete picture of the scope and nature of the public corruption scheme, and therefore "the facts that are known to the parties and the Court in 2011[ ] are different than those when the co-conspirator[s'] plea agreements were reached." (Dkt. No. 260 at 2.)

21    This Court can recall only once prior instance in twelve years where a probation officer recommended a materially different Guideline calculation than that agreed to by the parties. *See also* Remarks of Judge Patti B. Saris, *quoted in*

Wendy L. Pfaffenbach, *Federal Judges Reveal Tips on Evidence,* Mass. Law Wkly., Mar. 19, 2001 at B12 ("Sometimes the government and defendant have reached a plea agreement and probation disagrees with both the defendant and the government. In this situation, if I hold a [sentencing] hearing, it's an awkward proceeding....").

[22]  ⚑ U.S.S.G. § 2C1.7(c)(4) states: "If the offense is covered more specifically under ⚑ § 2C1.1 (Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right), § 2C1.2 (Offering, Giving, Soliciting, or Receiving a Gratuity), or § 2C1.3 (Conflict of Interest), apply the offense guideline that most specifically covers the offense."

[23]  In addition to the 2–level multiple bribe enhancement, ⚑ § 2C1.1 allows the government to seek a 20–level increase for "benefits received" instead of being limited to what it contends is a 16–level enhancement based on the amount of the bribes.

[24]  The fact that the Commentary following ⚑ § 2C1.1 lists the bribery and extortion statutes, but not the honest services fraud statute, does not alter this analysis. The Guidelines Manual is explicit that "[t]he list of 'Statutory Provisions' in the Commentary to each offense guideline does not necessarily include every statute covered by that guideline. In addition, some statutes may be covered by more than one guideline." ⚑ § 1B1.1 cmt. n. 3.

[25]  The government applied ⚑ § 2C1.1 to Scanlon and Abramoff, although this appears to have been due to the fact that both were also convicted of conspiracy to commit bribery. In any event, ⚑ § 2C1.1 had little impact on sentencing for either defendant, as their total offense levels were driven primarily by the separate fraud charges that stemmed from the "Gimme Five" kickback scheme to defraud the Indian tribes who were clients of Abramoff and Scanlon of millions of dollars. As for Abramoff, the loss to the Indians was calculated under his plea agreement to be $25,000,000 and as for Scanlon, the loss to the Indian tribes was calculated at between $7 million and $20 million.

[26]  The government's repeated assertion, however, that the U.S. Sentencing Commission deleted ⚑ § 2C1.7 and merged it with ⚑ § 2C1.1 because of the Supreme Court's ruling in *Skilling* is incorrect. (Dkt. No. 257 at 3 n. 2; Tr. 8/30/11 19:16–18, 20:4–11.) The Commission made this change in 2004—six years prior to *Skilling*—in order to "simplify guideline application." *See* U.S.S.G. Supplement to Appendix C, amend. 666 (noting that the effective date of this amendment was November 1, 2004).

[27]  The Court further notes that this enhancement was applied to both Scanlon and Abramoff. (*See* Appendix A.)

[28]  Under "relevant conduct" principles, the Court must take into account the benefit received by Ring's co-conspirators as well. *See* ⚑ U.S.S.G. § 1B1.3(a)(1)(B).

U.S. v. Ring, 811 F.Supp.2d 359 (2011)

29    These earmarks included $1.3 million for the City of Elk Grove, $1.4 million for a road for the Choctaw, $1.25 million for the Hopi Turquoise Trail project, and $1 million for the Agua Caliente. (*See* Dkt. No. 257 at 12.)

30    In this regard, it is significant that, in addition to the conspiracy count (Count I), Ring was convicted of only four of the eight substantive counts. Two of these counts (Count II and III) are based on the same conduct—giving Robert Coughlin four Wizards tickets with a face value of $77.25 each. With respect to John Albaugh, Ring was convicted only on Count VII, which involved two tickets to a Disney on Ice show at the Verizon Center. Finally, the last count of conviction (Count VIII) involved a $5,000 wire transmission to Julie Doolittle that was part of a $96,000 salary she was paid for her "consulting" job, which, according to the government, was a "little-work job."

31    🏳️⚠️ *United States v. Whitfield,* 590 F.3d 325 (5th Cir.2009) did not, as Ring claims, apply a "but for" causation standard (Dkt. No. 272 at 8), but rather dealt with the issue of quantifying the net value of the benefit that unquestionably resulted from bribery.

32    The government has presented even less evidence connecting Peter Evich's efforts in October 2001 to secure funding for the CNMI study (*see, e.g.,* GX–KR 220), with the tickets he requested nearly a year before in September 2000. (*See* GX–KR 281.)

33    For example, Ring was convicted of paying an illegal gratuity (Count II) and bribery/honest services fraud (Count III) on the basis of the same activity: providing Coughlin with Wizards tickets in exchange for contacting an INS employee to expedite the visa application of a student at the Eshkol Academy whom Abramoff wanted to bring over from Israel to play basketball at the school.

34    At Coughlin's sentencing, the parties disagreed as to whether the value of sporting tickets for sentencing purposes should be calculated based, as argued by the defendant, on their face value of $77.25 or, as argued by the government, based on the per-viewing proportion of the total price paid by Jack Abramoff and Greenberg Traurig for leasing the suite, $437.28. *Compare* Dkt. No. 17 at 10, *Coughlin,* No. 08–cr–111 (Nov. 18, 2009), *with* Dkt. No. 19 at 32 n. 120, 35, *Coughlin,* No. 08–cr–111 (Nov. 19, 2009).

35    The government's argument that the Court should look to the ticket costs because Ring was in a better position than Coughlin to know these costs (*see* Dkt. No. 257 at 17 n. 7) is therefore irrelevant.

36    Particularly troubling is the government's position that "corrupt payments" includes payments made to "either groom public officials for corruption or to continue the corrupt relations." (Dkt. 257 at 17–18; *see also* Tr. 8/30/11 73–76.). This position fails to take into account that gifts of meals and tickets to public officials are not necessarily criminal even if they are provided by someone seeking to curry favor or influence. As the Court instructed the jury:

It is not illegal to give a thing of value to a public official merely to build a reservoir of goodwill that might

ultimately affect one or more unspecified acts, now or in the future. Offering hospitality to a public official through payments for entertainment, sports events, and the like would not constitute violations of the illegal gratuities or honest services wire fraud statutes if the intent of the defendant was simply to cultivate a personal, business, or political friendship.

(Jury Instruction No. 28, Dkt. No. 222 at 30.) The Second Circuit reached a similar conclusion in *United States v. Ganim,* 510 F.3d 134 (2d Cir.2007) (Sotomayor, J.), when it affirmed the following instruction:

[B]ribery is not proved if the benefit is intended to be, and accepted as simply an effort to buy favor or generalized goodwill from a public official who either has been, is, or may be at some unknown, unspecified later time, be in a position to act favorably on the giver's interests—favorably to the giver's interest. That describes legal lobbying.... Public officials may lawfully receive a campaign contribution, and he or she may also lawfully accept a personal benefit if his or her intent in taking those items is solely to cultivate a relationship with the person or persons who provided them.

*Id.* at 149 (alteration and omission in original).

[37]     Even if the Court were to apply § 2C1.7, Ring's reading of "involved" as essentially being the same as "co-conspirator" is tortured. The Guidelines routinely use the term "involved" to describe the nature of the conduct, not the nature of the defendants or their co-conspirators. *See, e.g.,* § 2A1.5 ("If the offense involved the offer or the receipt of anything of pecuniary value"); § 2A2.2 ("If the assault involved more than minimal planning"); § 2A2.3 ("if the conduct involved physical contact"). Indeed, Ring's construction would mean that the 2–level enhancement in § 2B1.1 (where "the offense involved 10 or more victims") would apply only where those victims participated in the scheme themselves.

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

47 F.Supp.2d 25
United States District Court,
District of Columbia.

UNITED STATES of America
v.
Bassam Gharib MAKKI, Defendant.

Criminal No. 98–0334(PLF).
|
April 20, 1999.

**Synopsis**
Defendant pleaded guilty to two counts of misuse of a passport and one count of possession of a false document. Upon motions of both parties at sentencing, the District Court, Friedman, J., held that: (1) defendant's repeated misrepresentations about his identity warranted increase of base offense level for obstruction of justice under the Sentencing Guidelines; (2) fact that defendant pleaded guilty did not entitle him to two-level decrease for acceptance of responsibility; (3) defendant's prior uncharged conduct warranted increase of his criminal history category under the Sentencing Guidelines from Category I to Category III; and (4) defendant's alleged membership in terrorist organization was insufficient to warrant further upward departure of criminal history category.

Ordered accordingly.

West Headnotes (16)

**[1]** **Sentencing and Punishment**⚖️Obstruction of
Justice

To obtain an increase in a defendant's offense level for obstruction of justice under the Sentencing Guidelines, the government must prove by a preponderance of the evidence that the defendant obstructed justice and that his conduct was willful. 🚩U.S.S.G. § 3C1.1, 18 U.S.C.A.

**[2]** **Sentencing and Punishment**⚖️Obstruction of
Justice

To establish that a defendant's obstruction of justice was willful, as required to justify an increase in defendant's offense level for obstruction of justice under the Sentencing Guidelines, the government must establish that the defendant consciously acted with the purpose of obstructing justice. 🚩U.S.S.G. § 3C1.1, 18 U.S.C.A.

**[3]** **Sentencing and Punishment**⚖️Obstruction of
Justice

For purposes of establishing obstruction of justice under the Sentencing Guidelines by the provision of false information to a magistrate judge, a probation officer or a pretrial services agency, government need not show that defendant's misrepresentations significantly hindered its investigation. 🚩U.S.S.G. § 3C1.1, 18 U.S.C.A.

**[4]** **Sentencing and Punishment**⚖️Obstruction of
Justice

Defendant's repeated misrepresentations about his identity to magistrate judges, pretrial services, and law enforcement officials in connection with his arrest for misuse of a passport and possession of a false document established that he willfully obstructed justice, as required to increase base offense level under the Sentencing Guidelines; defendant did not divulge his true identity even when confronted with falsity of his initial identification. 18 U.S.C.A. §§ 1544, 🚩1546(a); 🚩U.S.S.G. § 3C1.1, 18 U.S.C.A.

**[5]**    **Sentencing and Punishment**⚑Obstruction of Justice

For purposes of establishing obstruction of justice under the Sentencing Guidelines by the provision of false information, the identity and history of a defendant are always relevant to a court's rulings, whether they concern detention, removal or sentencing. 18 U.S.C.A. §§ 1544, ⚑1546(a); ⚑U.S.S.G. § 3C1.1, 18 U.S.C.A.

**[6]**    **Sentencing and Punishment**⚑Acceptance of Responsibility

If a sentencing court finds that the defendant obstructed justice, it may only depart downward for acceptance of responsibility under the Sentencing Guidelines in extraordinary cases. ⚑U.S.S.G. § 3E1.1(a), 18 U.S.C.A.

**[7]**    **Sentencing and Punishment**⚑Acceptance of Responsibility

Fact that defendant immediately admitted to arresting officers that he committed offenses of misuse of a passport and possession of a false document and pleaded guilty to such offenses did not entitle defendant to two-level decrease in his offense level under the Sentencing Guidelines for acceptance of responsibility, in light of defendant's failure to admit his true identity until after government had demonstrated it through fingerprint analysis. 18 U.S.C.A. §§ 1544, ⚑1546(a); ⚑U.S.S.G. § 3E1.1(a), 18 U.S.C.A.

**[8]**    **Sentencing and Punishment**⚑Inadequacy of Criminal History Category

A sentencing court has discretion to determine whether a criminal history category under the Sentencing Guidelines accurately reflects a defendant's criminal history. ⚑U.S.S.G. § 4A1.3, 18 U.S.C.A.

**[9]**    **Sentencing and Punishment**⚑Necessity

Any adjustments to a defendant's criminal history under the Sentencing Guidelines must be clearly explained and justified. ⚑U.S.S.G. § 4A1.3, 18 U.S.C.A.

**[10]**    **Sentencing and Punishment**⚑Necessity

When departing upward from a defendant's criminal history category under the Sentencing Guidelines, a sentencing court generally must explain why each lower criminal history category is not sufficient to account for the defendant's criminal history. ⚑U.S.S.G. § 4A1.3, 18 U.S.C.A.

**[11]**    **Sentencing and Punishment**⚑Inadequacy of Criminal History Category

In determining what criminal history category most accurately reflects a defendant's true criminal history under the Sentencing Guidelines, a court may evaluate the defendant's unconsidered conduct or attributes by analogy to factors that are considered under the Guidelines. ⚑U.S.S.G. § 4A1.3, 18 U.S.C.A.

**[12]**    **Sentencing and Punishment**⚑Offense or Adjudication in Other Jurisdiction

Defendant's conviction in German court for attempting to participate in a felony of causing an explosion was reliable information that could be considered in determining whether departure from base offense level was warranted under the Sentencing Guidelines; German judgment provided summary of court proceedings and testimony which led to defendant's conviction, and defendant was represented by counsel in German proceedings and given opportunity to testify and confront witnesses against him.

⚑U.S.S.G. § 4A1.3, 18 U.S.C.A.

**[13]**    **Sentencing and Punishment**⚑Inadequacy of Criminal History Category

Defendant's prior conviction in German court for attempting to participate in a felony of causing an explosion, for which defendant was sentenced to two years in prison, warranted increase of defendant's criminal history category under the Sentencing Guidelines from Category I to Category II. ⚑U.S.S.G. § 4A1.3, 18 U.S.C.A.

**[14]**    **Sentencing and Punishment**⚑Related Cases

Defendant's prior uncharged conduct of making misrepresentations on visa applications was properly considered in determining whether departure from base offense level was warranted under the Sentencing Guidelines for defendant's offenses of misuse of a passport and possession of a false document; such conduct was similar to charged offenses. 18 U.S.C.A. §§ 1544, ⚑1546(a); ⚑U.S.S.G. § 4A1.3, 18 U.S.C.A.

**[15]**    **Sentencing and Punishment**⚑Inadequacy of Criminal History Category

Defendant's prior uncharged conduct of making misrepresentations on visa applications, together with his prior conviction in German court for attempting to participate in a felony of causing an explosion, warranted increase of defendant's criminal history category under the Sentencing Guidelines from Category I to Category III. ⚑U.S.S.G. § 4A1.3, 18 U.S.C.A.

**[16]**    **Sentencing and Punishment**⚑Sufficiency

Affidavits of government agents containing conclusory and uncorroborated statements regarding defendant's alleged membership in terrorist organization and activities with such organization were insufficient to warrant upward departure of defendant's criminal history category under the Sentencing Guidelines. ⚑U.S.S.G. § 4A1.3, 18 U.S.C.A.

**Attorneys and Law Firms**

**\*27** Tina Elena Sciocchetti, U.S. Atty's Office, Washington, DC, for U.S.

Teresa Alva, Federal Public Defender for D.C., Washington, DC, for defendant.

*OPINION*

FRIEDMAN, District Judge.

Defendant, Bassam Gharib Makki, pleaded guilty on December 16, 1998 to two counts of misuse of a passport in violation of 18 U.S.C. § 1544 and one count of possession of a false document in violation of 18 U.S.C. § 1546(a). The Court now considers three matters that relate to sentencing: (1) the government's request that the Court add two offense levels to the base offense level because defendant obstructed justice; (2) defendant's request that the Court reduce his base offense level by two levels in light of his acceptance of responsibility; and (3) the government's request that the Court depart upward to change defendant's Criminal History Category from I to IV on the basis of his 1989 German conviction for "attempting to participate in a felony causing an explosion," his 1993 U.S. visa application violations for which he was not prosecuted, and his alleged status and activities as a senior lieutenant in the terrorist organization Hizballah.

Upon consideration of the presentence investigation report prepared by the Probation Office, the parties' memoranda in **\*28** aid of sentencing, defendant's response to the government's memorandum in aid of sentencing, and defendant's filing in aid of sentencing, and having heard the arguments and proffers of counsel in open court, the Court will adjust defendant's offense level upward for obstruction of justice, will not adjust it downward for acceptance of responsibility and will consider his foreign conviction and his prior unprosecuted violations of the immigration laws but not his alleged Hizballah status or activities. The Court therefore finds that defendant's offense level is ten rather than six and that it is appropriate to depart upward from Criminal History Category I to Criminal History Category III.

## I. BACKGROUND

Defendant was arrested on September 18, 1998 outside the Brazilian Consulate in Ciudad del Este, Paraguay after he tried for the second time in two days to obtain a tourist visa to Brazil using an altered U.S. passport. The passport defendant was using bore the name of his brother, Mohamad Gharib Makki, but had defendant's picture on it. On both occasions he presented his brother's passport and claimed to be his brother and, on the second occasion, he filled out an application in Mohamad's name. Authorities from the United States arrested defendant because they believed him to be his brother Mohamad,

who is a fugitive from the United States wanted in New York City for mail fraud and wire fraud.

After his arrest, defendant told representatives of the U.S. State Department in Paraguay that he was Mohamad Gharib Makki. When officials from the FBI Joint Terrorism Task Force arrived, they had a photograph of Mohamad Gharib Makki and immediately recognized that defendant was not Mohamad. Defendant then claimed to be Hassan Mohamad Makki, a Lebanese citizen and Mohamad Gharib Makki's cousin, and said that he had stolen Mohamad Gharib Makki's passport to travel to Paraguay to start a business. After defendant was transported to Miami, Florida for prosecution in the United States, he continued to maintain that he was Hassan Mohamad Makki during his initial appearance under oath before U.S. Magistrate Judge Robert L. Dube, in his interview with the U.S. Pretrial Services Agency in Miami and during removal proceedings before U.S. Magistrate Judge Peter R. Palermo. He provided Hassan Makki's birth date, wife's name, children's names and ages and other information consistent with Hassan's identity, not his own. Even after the government learned of defendant's true identity through a confidential informant, and after the government confirmed this fact through fingerprints obtained from Germany, defendant contested the truth of these facts. It was not until the presentence investigation report was being prepared by the Probation Office of this Court that defendant finally admitted his true identity as Bassam Gharib Makki.[1]

Once before this Court, defendant moved to dismiss the indictment on the grounds that the United States lacked jurisdiction over his conduct in Paraguay with the intention of traveling to Brazil. After hearing argument, the Court denied the motion because international law recognizes the right of the United States to punish conduct that undermines the integrity of the official documents of the United States. *See* Order of December 9, 1998. Defendant then pleaded guilty to the entire indictment with no plea agreement, and the matter was scheduled for sentencing. Under the Sentencing Guidelines, the base offense level for violations of both misuse of a passport under 18 U.S.C. § 1544 and possession of a false document under 18 U.S.C. § 1546(a) is a level eight, *see* U.S.S.G. § 2L2.2, and the defendant normally would be entitled to a two level downward adjustment for pleading guilty and accepting responsibility. **\*29** U.S.S.G. § 3E1.1. There is no indication that defendant has any prior convictions in the United States and he therefore has zero criminal history points. At an offense level of six and Criminal History Category of I, the Guideline sentencing range would be zero to six months.

The government has submitted voluminous materials pertaining to defendant's alleged past criminal conduct. It provided the judgment and corresponding documents from defendant's criminal trial in Germany, at which defendant was convicted and sentenced to two years in prison for attempted participation in bringing about an explosion. *See* December 22, 1989 Judgment of the First Criminal Chamber of the Munich Landgericht, Gov't Memorandum, Exh. 20 ("German Judgment"). The government also filed the statement of a State Department official and supporting documentation alleging that defendant had misrepresented his marital status, employment, residence and criminal history on immigrant visa applications he submitted to the United States Consulate in Syria in September of 1993 and again in October of 1993. *See* Statement of Gary R. Hobin. Gov't Memorandum, Exh. 25 ("Hobin Statement").[2] Finally, the government has provided a wealth of material regarding defendant's purported terrorist activities, including affidavits from two government agents that describe the allegations of confidential informants that defendant is a senior lieutenant in the Hizballah. *See* Affidavit of Michael J. Hudspeth, Gov't Memorandum, Exh. 13 ("Hudspeth Aff."); Affidavit of Hector Rodriguez, Gov't Memorandum, Exh. 23 ("Rodriguez Aff.").

## II. DISCUSSION

### A. Obstruction of Justice

[1] [2] Section 3C1.1 requires a two-level increase in a defendant's offense level if he or she willfully obstructed or attempted to obstruct justice during the investigation or prosecution of the offense for which he or she was convicted. U.S.S.G. § 3C1.1; *see United States v. Dozier,* 162 F.3d 120, 123 (D.C.Cir.1998). Under the Guidelines, the government must prove by a preponderance of the evidence that the defendant obstructed justice and that his conduct was willful.[3] To establish willfulness, the government must establish "that the defendant consciously act[ed] with the purpose of obstructing justice." *United States v. Monroe,* 990 F.2d 1370, 1376 (D.C.Cir.1993) (quoting *United States v. Thompson,* 962 F.2d 1069, 1071

(D.C.Cir.1992)).

[3] The Application Notes to Section 3C1.1 provide a list of examples of the types of conduct that qualify as obstruction of justice. They include, among other things, (1) "providing materially false information to a judge or magistrate," (2) "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense," and (3) "providing materially false information to a probation officer in respect to a presentence or other investigation for the court." U.S.S.G. § 3C1.1 App. Note 4. While the government has not shown by a preponderance of the evidence **\*30** that defendant's misrepresentations significantly hindered the investigation, such a showing is not necessary to establish obstruction of justice by the provision of false information to a magistrate judge, a probation officer or a pretrial services agency. *See, e.g., United States v. Restrepo,* 53 F.3d 396, 397 (1st Cir.1995) (a showing of significant obstruction is not required for "materially false statements made to probation officers and, by analogy, pretrial services officers, in respect to an investigation for the court...."); *United States v. Mafanya,* 24 F.3d 412, 415 (2d Cir.1994) (use of false identity before magistrate judge was obstruction of justice even when true identity discovered before detention hearing). Defendant's conduct therefore is exactly the type of misleading conduct for which the obstruction of justice enhancement was intended.

[4] Defendant claims that his misrepresentations about his identity were not willful because he made them out of fear and negligence. While the Court might accept that a defendant who is transported to a foreign country could initially withhold his name from investigators out of fear, this explanation cannot account for the pervasive pattern of misleading information that defendant provided to the magistrate judges, to Pretrial Services, and to law enforcement officials. Once defendant was confronted with the falsity of his initial statement that he was Mohamad Gharib Makki, he still did not divulge his true identity. Instead, he fabricated another story, telling investigators that he was Hassan Mohamad Makki, and provided not just a false name, but a completely false identity, including Hassan Mohamad Makki's birthdate and the names and ages of his wife and children. This conduct is much more suggestive of a defendant who is trying to prevent law enforcement officials from learning his true identity and international criminal history. The Court therefore concludes that the government has established defendant's willful obstruction by a preponderance of the evidence.

[5] Defendant also argues that his misrepresentations were not material because his identity was not relevant at the time he made the false statements. A "material" misrepresentation is any "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." 🔖 U.S.S.G. § 3C1.1 App. Note 6. Defendant contends that because he did not contest his detention or the removal of his case in the Miami proceedings, his misrepresentations to Magistrate Judge Dube, Magistrate Judge Palermo and the Pretrial Services Agency could not have been material because they would not "tend to influence or affect the issue under determination."[4] This cannot be true. While defendant may not have contested his treatment, the identity and history of a defendant are always relevant to a court's rulings, whether they concern detention, removal or sentencing. *See* 🔖 *United States v. Mafanya,* 24 F.3d at 415 (use of false identity in detention hearing was obstruction of justice); *United States v. Montano–Silva,* 15 F.3d 52, 53 (5th Cir.1994) ("It would be a rare situation in which a defendant's identity is not material"); 🔖 *United States v. McDonald,* 964 F.2d 390, 392–93 (5th Cir.1992) (using false identity before a magistrate judge is obstruction of justice). Defendant's misrepresentations to Magistrate Judge Palermo and the Pretrial Services Agency in Miami were material.

Finally, the government has established by a preponderance of the evidence that defendant continues to misrepresent facts regarding his identity to this Court. Defendant told the Probation Office of this Court that "[h]e assumed the name Hassan Mohamad Makki due to the great shame he felt and the potential problems that he would face in his country [Lebanon] **\*31** due to his [German] conviction." Presentence Investigation Report ¶ 14. None of the documents provided to the Court by the parties, including defendant's 1993 visa applications and the documents regarding his business in Lebanon, however, demonstrate that defendant has ever used this alias in Lebanon or anywhere else. In fact, defendant has provided no evidence of his use of the name Hassan Mohamad Makki before he used it in trying to mislead the court and law enforcement officers in Miami. This misrepresentation is material to the very inquiry undertaken by the Probation Officer in preparing the presentence investigation report because it speaks to defendant's motivation for his obstructive conduct in Miami. The Court also finds that this misrepresentation was made willfully given the pattern of deceptive conduct in which defendant has engaged in this case.

## B. Acceptance of Responsibility

[6] The Sentencing Guidelines provide for a two-level decrease in a defendant's offense level if he "clearly demonstrates acceptance of responsibility for his offense." 🔖 U.S.S.G. § 3E1.1(a). If the Court finds that the defendant obstructed justice, however, it may only depart downward for acceptance of responsibility in "extraordinary cases," because ordinarily an enhancement for obstruction of justice indicates that the defendant is attempting to evade responsibility for his criminal conduct. *Id.* App. Note 4; *see* 🔖 *United States v. Dozier,* 162 F.3d at 127. The burden is on the defendant to demonstrate that his case is "extraordinary." *Id.*

[7] Defendant contends that this is an "extraordinary" case because he immediately admitted the offense to the arresting officers and pleaded guilty to the entire indictment, thereby allowing the government to avoid the cost of trial, and because he clearly accepted and demonstrated personal responsibility for the offense. Defendant did not truly accept personal responsibility for his offense, however, until he admitted his true identity, which he acknowledged only grudgingly and only after the government had demonstrated his true identity through fingerprint analysis. Only then and after losing a motion to dismiss did he plead guilty quickly and seek a prompt sentencing, apparently in the hope that sentencing would take place before the Court learned about his conviction in Germany, his 1993 visa applications and his other alleged activities. This is not an "extraordinary case" in which adjustments for obstruction of justice and acceptance of responsibility apply simultaneously. *See* 🔖 *United States v. Smaw,* 993 F.2d 902, 905 n. 2 (D.C.Cir.1993) (case where defendant pleaded guilty but made material misrepresentation to probation officer is not "extraordinary" case justifying both an adjustment for obstruction of justice and an adjustment for acceptance of responsibility).

## C. Criminal History

The defendant has no criminal convictions in the United States and therefore has zero criminal history points under the Guidelines. Under a traditional analysis, the defendant therefore would have a Criminal History of I. The government, however, requests that the Court depart from the otherwise applicable Guideline sentencing range to a Criminal History Category of IV pursuant to 🔖 Section

4A1.3 of the Sentencing Guidelines. *See* U.S.S.G. § 4A1.3. Section 4A1.3 allows the Court to depart upward "[i]f reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3. "Reliable information" includes, among other things, (1) "prior sentence(s) not used in computing the criminal history category (*e.g.*, sentences for foreign or tribal offenses)," and (2) "prior similar adult criminal conduct not resulting in a criminal conviction." *Id.* The government has the burden of justifying **\*32** any upward departure by a preponderance of the evidence. *See United States v. Alberto–Genao,* 28 F.Supp.2d 658, 663 (D.D.C.1998) ( "Whenever the government seeks an upward adjustment or upward departure that might lead to an increase in the sentence under the Sentencing Guidelines, it has the burden of proof by a preponderance of the evidence").

[8] [9] [10] [11] While the Court has discretion to determine whether a criminal history category accurately reflects a defendant's criminal history, *United States v. Robinson,* 158 F.3d 1291, 1294 (D.C.Cir.1998), any adjustments under Section 4A1.3 must be clearly explained and justified. *See United States v. Allen,* 898 F.2d 203, 204–05 (D.C.Cir.1990) (when going above a Criminal History Category of VI, "the court should state definitively its reasons for that determination"). When departing upward, the Court generally must explain why each lower criminal history category is not sufficient to account for the defendant's criminal history. *See id.* at 205; *see also United States v. Tropiano,* 50 F.3d 157, 162 (2d Cir.1995) ( "[T]he district court must pause at each category to consider whether that category adequately reflects the seriousness of the defendant's record. Only upon finding a category inadequate may the court proceed to the next category").[5] In determining what criminal history category most accurately reflects a defendant's true criminal history, a court may evaluate the defendant's unconsidered conduct or attributes by analogy to factors that are considered under the Guidelines. *See* U.S.S.G. § 4A1.3 ("In considering a departure under this provision, the Commission intends that the court use, as a reference, the guideline range for a defendant with a higher or lower criminal history category, as applicable"). *See also United States v. Jackson,* 921 F.2d 985, 991 (10th Cir.1990) ("The 'extrapolation from ... or ... analogy to' the Guidelines we have recommended should be a relatively simple procedure in departures based on criminal history") (quoting *United States v. Gardner,* 905 F.2d 1432, 1438 (10th Cir.1990)).

In this case, the Court must ascertain whether "reliable information" exists to indicate that a Criminal History Category of I understates either the "seriousness of the defendant's past criminal conduct" or the "likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3. Regarding the "seriousness of the defendant's past criminal conduct," the government asserts that an upward departure is justified because a Criminal History Category of I does not reflect (1) defendant's 1989 conviction in Germany, (2) defendant's false statements on his 1993 visa applications, and (3) defendant's other alleged terrorist activities. The government also contends that defendant's purported membership in the Hizballah and his alleged terrorist activities increase the "likelihood that the defendant will commit other crimes." [6] **\*33** The Court concludes that defendant's criminal conviction in Germany and the misrepresentations made in connection with his 1993 visa applications should be considered as reliable information justifying a departure under Section 4A1.3, but that his alleged membership in the Hizballah and his alleged terrorist activities should not.

[12] A foreign sentence is explicitly contemplated as a grounds for an upward departure under Section 4A1.3. *See* U.S.S.G. § 4A1.3(a).[7] The German Judgment provides a summary of the court proceedings and testimony which led to defendant's conviction for "attempting to participate in a felony of causing an explosion." *See* German Judgment at 19. Among the factual findings the German court made were that defendant was conspiring with others to conduct surveillance of American and Israeli sites in Germany in order to identify potential targets for terrorist bombing attacks and that defendant was personally involved in such surveillance. *See id.* at 19–20. The German court also found that defendant had attempted to send a message to a person in Lebanon stating in code that he had located United States and Israeli targets in Germany and that he would carry out attacks on them if he was provided with weapons and dynamite. *See id.* at 5–10. The German court rejected his defense that he acted under duress. *See id.* at 11–15. While defendant argues that the Court should not give full credence to the fairness of criminal proceedings and judgments in all foreign countries, the Court has no reason to view German courts with any skepticism. Defendant was represented by counsel in the German proceedings, was confronted with the witnesses against him and was permitted to testify in his own behalf. The Court will consider defendant's German conviction.

[13] The defendant was sentenced by the German court to

two years in prison. By analogy to the Guidelines, *see* U.S.S.G. § 4A1.3; *United States v. Jackson,* 921 F.2d at 991, if a court in this country had sentenced the defendant in that case, this Court would then assign three criminal history points to that conviction. *See* U.S.S.G. § 4A1.1(a) (three points added for "each prior sentence of imprisonment exceeding one year and one month"). Three criminal history points would increase defendant's Criminal History Category from Category I to Category II. The Court therefore will increase defendant's Criminal History Category to II on the basis of the German conviction.

[14] A Criminal History Category of II, however, still understates defendant's criminal history because it does not consider his misrepresentations on his 1993 visa applications. The 1993 visa documents contain patently false statements regarding defendant's marital status, lack of paternity, employment, residence and criminal history. *See* Hobin Statement and Application for Immigrant Visa and Alien Registration, Gov't Memorandum, Exh. 25. Most significantly, defendant stated that he had never been arrested, convicted or in prison. *See id.* at 2. Defendant's false statements in 1993, made under oath, constitute criminal offenses in violation of 18 U.S.C. § 1546(a) (presenting visa documents containing false statements) and 18 U.S.C. § 1001 (false statements to United States government officials). Because defendant's false **\*34** statements on his visa applications involve misrepresentations made on immigration documents, they are similar offenses to the passport offense for which he pleaded guilty in this case. The 1993 conduct therefore constitutes "prior similar adult criminal conduct not resulting in a criminal conviction," and is thus precisely the type of conduct that justifies a criminal history category departure. *See* U.S.S.G. § 4A1.3.

Defendant contends that the Court should not consider his misrepresentations on his 1993 visa applications because it is conduct that is already taken into account by Section 2L2.2 of the Guidelines. Section 2L2.2 states that the Court should increase the offense level for the fraudulent use of a passport if the defendant has already sustained another conviction for an immigration offense in the past. U.S.S.G. § 2L2.2(b)(2)(A). Defendant argues that the Court should read this provision as the Guidelines' exclusive consideration of prior immigration offenses in the context of sentencing for a subsequent immigration offense and thus should read it to exclude the consideration of uncharged immigration offenses under Section 4A1.3. *See* 18 U.S.C. § 3553(b). The Guidelines, however, anticipate the

consideration of both past *convictions* under Section 2L2.2 and prior *uncharged conduct* under Section 4A1.3. Section 2L2.2 only governs the consideration of past convictions and does not speak to the consideration of past uncharged conduct, while Section 4A1.3 gives the Court discretion to consider similar criminal conduct that did not result in a conviction if the failure to do so would significantly understate the defendant's past history.

[15] If defendant had been charged with and convicted of the 1993 misrepresentations on his visa applications, he would have had at least two additional criminal history points under the Guidelines. A conviction for submitting fraudulent visa applications would have had a base offense level of eight under Section 2L2.2. An offense level of eight and a Criminal History Category of II (defendant's criminal history after consideration of the 1989 German conviction) would result in a Guideline sentencing range of 4–10 months, and a sentencing court therefore would have sentenced defendant to at least 120 days in prison. *See* U.S.S.G. § 4A1.1(b) (two points added for "each prior sentence of imprisonment of at least sixty days" that is not already considered).[8] When the Court adds these two criminal history points to the points defendant would have received as a result of his German conviction, it concludes that defendant would have had at least five criminal history points if he had been convicted of his prior conduct in the United States. Because five points would give defendant a Criminal History Category of III, and because the Court finds that this criminal history category accurately reflects "the seriousness of the defendant's past criminal conduct," the Court departs upward to assign defendant a Criminal History Category of III.

[16] Finally, the government requests that the Court depart even further on the basis of defendant's alleged terrorist activities with and membership in the Hizballah. At the sentencing hearing, government counsel argued that defendant's membership in a terrorist organization warrants an upward departure both because defendant's past criminal conduct is **\*35** understated and because it indicates that defendant is more likely to continue his criminal activities. *See* U.S.S.G. § 4A1.3. To support its assertion, the government relies primarily on defendant's past conviction for terrorist activities in Germany, defendant's presence in the tri-border region where the boundaries of Paraguay, Brazil and Argentina meet and in which the United States has noted an increased level of terrorist activity, and two affidavits from United States law enforcement agents relaying

U.S. v. Makki, 47 F.Supp.2d 25 (1999)

information provided by confidential informants. The affidavit of Special Agent Michael J. Hudspeth of the United States Department of State describes the allegations of a confidential informant in Lebanon, while the affidavit of Agent Hector Rodriguez of the Federal Bureau of Investigation describes the allegations of a confidential informant who lives in the tri-border region. *See* Hudspeth Aff. ¶ 3; Rodriguez Aff. ¶ 2.

Defendant contends that the Court should not consider the information contained in the two affidavits because they contain hearsay within hearsay and lack any corroboration. *See* 🏳 *United States v. Chunza–Plazas,* 45 F.3d 51, 58 (2d Cir.1995). Section 6A1.3 of the Guidelines allows the Court to "consider relevant information without regard to its admissibility under the rules of evidence at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." 🔖 U.S.S.G. § 6A1.3; *see* 🏳 *United States v. Hill,* 131 F.3d 1056, 1065 (D.C.Cir.1997). "Out-of-court declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means." 🏳 U.S.S.G. § 6A1.3 commentary; *see* 🚩 *United States v. Fatico,* 579 F.2d 707, 713 (2d Cir.1978). Here the government has demonstrated good cause for the non-disclosure of the informants' identities, and the agents' affidavits demonstrate the past reliability of the informants. *See* Hudspeth Aff. ¶¶ 3,7; Rodriguez Aff. ¶ 2.

The problem is that much of the information contained in the affidavits is conclusory, not factual, and where the information is factual, the information provided by the informant with respect to the defendant's activities has not been corroborated. *See* 🏳 *United States v. Ortiz,* 993 F.2d 204, 208 (10th Cir.1993) (confidential informant's statements must have "sufficient corroboration by other means"); *cf.* 🚩 *United States v. Fatico,* 579 F.2d at 713 (confidential informant's information regarding defendants' mafia membership was corroborated by defendants' co-conspirators). In fact, while both Agent Hudspeth and Agent Rodriguez attest to the reliability of their informants in the past, *see* Hudspeth Aff. ¶ 3; Rodriguez Aff. ¶ 2, only Agent Hudspeth relays any information about the defendant that was corroborated by any means. Agent Hudspeth's confidential informant provided identifying information about defendant that was corroborated by the defendant himself when he admitted to his true identity. *See* Hudspeth Aff. ¶¶ 4–5. With regard to defendant's alleged past terrorist conduct as a member of the Hizballah, however, the government's affidavits do not provide any factual basis for this claim.

While there is extensive information provided with respect to the terrorist activities of the Hizballah itself and the activities of other persons, the only specific conduct alleged by the government on the part of defendant is the conduct that resulted in his German conviction and the misrepresentations made in his visa applications in 1993 and in 1998. The Court has already considered this conduct in deciding to depart upward to a Criminal History Category of III. The government also alleges that defendant was conspiring to commit criminal acts during his trip to South America, but it does not allege any specific conduct, much less provide any evidence. *See* Hudspeth Aff. ¶ 6 ("[W]hatever Bassam's activities were in Paraguay, Bassam was sent to Paraguay at the express **\*36** direction of [Hizballah Secretary] Nasrallah and was executing specific functions of the Hizballah"). Thus, there is no grounds to depart upward for defendant's alleged past criminal conduct as a member of the Hizballah.

Neither affidavit offered by the government provides anything but conclusory statements that defendant was engaged in terrorist activity on behalf of the Hizballah. When the Court questioned government counsel at the sentencing hearing about the facts underlying these conclusory statements, counsel was unwilling to provide any factual underpinnings for the conclusions because to do so "would compromise the identity of the informant." Transcript of April 12, 1999 Sentencing at 20.[9] While concern for and protection of government informants, of course, is most legitimate and often essential to law enforcement and the personal safety of important sources of information, the government also must prove facts by a preponderance of the evidence in order to obtain an upward departure under the Sentencing Guidelines. It simply has not done so in this instance.

The government also has not provided enough evidence for the Court to draw any inferences about defendant's terrorist activities from his presence in a South American region of high terrorist activity. As the government itself noted, "[t]he tri-border area is home to more than 12,000 Arab immigrants, most of whom have settled in the area for legitimate commercial purpose." Gov't Memorandum at 12. While the affidavit of Agent Rodriguez provides information from the confidential informant that defendant met with Hizballah figures in the tri-border region and was accompanied by a key Hizballah facilitator throughout his trip there, *see* Rodriguez Aff. ¶¶ 6–8, 12, these assertions are not a sufficient basis from which to draw the inferences the government seeks. Even if these facts were corroborated, the mere fact that defendant meets with or associates with others who may

U.S. v. Makki, 47 F.Supp.2d 25 (1999)

be Hizballah members is not enough to find that defendant himself had nefarious objectives while in the tri-border region. *Cf.* United States v. Patriarca, 807 F.Supp. 165, 169–70 (D.Mass.1992) (government must prove specific conduct, not just mafia membership, by preponderance of the evidence for court to depart upward under Section 4A1.3), *vacated on other grounds by* United States v. Carrozza, 4 F.3d 70 (1st Cir.1993).

Finally, the government contends that defendant's alleged membership and/or high level position in the Hizballah justifies a departure under Section 4A1.3 because it suggests that such membership makes him more likely to commit criminal acts in the future. Defendant may well be a senior lieutenant in the Hizballah, and Agent Hudspeth's confidential informant states that he has "personal knowledge" that defendant holds such a position, see Hudspeth Aff. ¶ 2, but there is no underlying factual predicate presented in the Hudspeth affidavit that establishes the basis for the informant's knowledge. The Court ***37** cannot accept the informant's assertion of personal knowledge without being able to evaluate the source and accuracy of such knowledge and the reliability of the information on which it is based. See U.S.S.G. § 6A1.3. The statement that Agent Rodriguez's informant, who does not know the defendant, has "learned that Makki was involved in the military arm of Hizballah" adds nothing. Rodriguez Aff. ¶ 4. The government simply has not proven the defendant's membership in the

Hizballah by a preponderance of the evidence. Even accepting the proposition that membership in an organization alone would be enough to enhance a defendant's sentence, the simple invocation of the word "Hizballah"—like the word "Mafia" in other cases—is not a basis for disregarding the relevant burden of proof and other due process protections to which any defendant is entitled. *See* United States v. Patriarca, 807 F.Supp. at 200–09. As the government has not established defendant's Hizballah membership or terrorist activities by a preponderance of the evidence, the Court will not increase his criminal history category based on these allegations.

For all of the foregoing reasons, the Court determines under Section 4A1.3 of the Sentencing Guidelines that it is appropriate to depart from the otherwise applicable Criminal History Category of I to Criminal History Category III. With an offense level of 10 and a Criminal History Category of III, defendant's Guideline sentencing range is 10 to 16 months.

SO ORDERED.

**All Citations**

47 F.Supp.2d 25

**Footnotes**

1    Defendant also told the Probation Officer that he uses the alias Hassan Makki because of his embarrassment about his 1989 conviction in Germany for terrorist activity.

2    The government states that it did not prosecute this offense because it was not aware of it until after the statute of limitations had run.

3    At one time, our court of appeals made a distinction between the government's burden of proof in cases of obstruction based on perjury and the government's burden in all other cases of obstruction. *See* United States v. Montague, 40 F.3d 1251, 1253 (D.C.Cir.1994). The distinction was based on a reading of the then-effective Application Note 1 to § 3C1.1, which stated that with regard to "alleged false testimony or statements by the defendant, such testimony or statements should be evaluated in a light most favorable to the defendant." *Id.* (quoting U.S.S.G. § 3C1.1 App. Note 1 (1994)). The U.S. Sentencing Commission, however, eliminated the distinction in 1997 when it amended Application Note 1 "so that it no longer suggests the use of a heightened

standard of proof [when the court applies an enhancement for perjury]." U.S.S.G. Appendix C, amend. 566 (1997).

4    The Court does not rely on defendant's misstatements in his hearing before Magistrate Judge Dube because defendant was not provided with an interpreter or an attorney after he had requested them.

5    There is a conflict in the circuits on this point, *see* *United States v. Lambert,* 984 F.2d 658, 663 (5th Cir.1993); *United States v. Jackson,* 921 F.2d 985, 991 (10th Cir.1990), but our circuit has not yet addressed it directly.

6    The government requests the Court to depart upward to a Criminal History Category of IV. Under the government's analysis, the departure is justified on the basis of a holistic evaluation of defendant's alleged past conduct and criminal propensities. The government also argues that this case is similar to *United States v. Kikumura,* 918 F.2d 1084 (3d Cir.1990), in which the government claims that the Third Circuit assigned a Criminal History Category of IV to a defendant accused of terrorism. As an initial matter, the government's reliance on the *Kikumura* case to support its request for a departure to a Criminal History Category of IV is misplaced. The court in *Kikumura* in fact approved an upward departure to a Criminal History Category of VI. *See* *United States v. Kikumura,* 918 F.2d 1084, 1115 (3d Cir.1990) ("[W]e think it would be reasonable to analogize Kikumura to a category VI offender"). It is also noteworthy that because of the magnitude of the departure in *Kikumura,* the Third Circuit required proof by clear and convincing evidence, not merely a preponderance, before approving the departure. *See id.* at 1101–02. Most importantly, the decision to depart under Section 4A1.3 is a fact specific inquiry and must be based on the facts of the case before the Court, not the facts of the *Kikumura* case.

7    Defendant argues that the statement in Section 4A1.3 that an upward departure is warranted when a defendant has "several previous foreign sentences" means that the Court should disregard a single foreign conviction. *See* U.S.S.G. § 4A1.3. This interpretation, however, is contradicted by the language of the Guidelines. The Guidelines are explicitly written to anticipate either one prior sentence or multiple prior sentences that were not used in computing criminal history. *See id.* ("prior *sentence(s)* not used in computing the criminal history category") (emphasis added).

8    The analogy, of course, is not perfect and the Court cannot know for certain what a sentencing court would have done. Indeed, if defendant had pleaded guilty to the 1993 uncharged offense, he probably would have had an adjusted offense level of six rather than eight and the Court could have imposed a sentence of as little as 30 days in prison (the range for offense level six and Criminal History Category II is 1–7 months). This lesser sentence, however, would have still given defendant an additional criminal history point, which, when added to the three points he would have received for his German conviction, still would have given him a Criminal History Category of III.

9    MS. SCIOCCHETTI [the prosecutor]: But, Your Honor, an informant tells you five facts. The fifth of which [is] he is a lieutenant in the Hizballah.

THE COURT: That's not a fact. That's a conclusion. What is the basis for that conclusion? What are the facts

that the confidential informant told you?

MS. SCIOCCHETTI: With respect to what?

THE COURT: I mean I can say I know you and your brother and sister ... and, by the way, she's—she deals in narcotics. That would not be enough in a criminal case. I would have to say I've dealt with you in narcotics or I sold you narcotics or I bought narcotics from you or I observed you or whatever. I can't say you're a drug dealer. That's not evidence.

MS. SCIOCCHETTI: Well, Your Honor, I think the—the affidavit does not set forth each of the factors—

THE COURT: What are the facts? What are the factors?

MS. SCIOCCHETTI: I'm not prepared to say because it would compromise the identity of the informant.

Transcript of April 12, 1999 Sentencing Hearing at 20.

---

                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

**WESTLAW**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.                                                12

U.S. v. Monroe, 990 F.2d 1370 (1993)

301 U.S.App.D.C. 100

KeyCite Yellow Flag - Negative Treatment
Distinguished by U.S. v. Reeves, D.C.Cir., November 10, 2009

990 F.2d 1370
United States Court of Appeals,
District of Columbia Circuit.

UNITED STATES of America,
v.
Monica MONROE, Appellant.

No. 91-3241.
|
Argued Jan. 12, 1993.
|
Decided April 30, 1993.

**Synopsis**

Defendant was convicted in the United States District Court for the District of Columbia, Thomas Penfield Jackson, J., of aiding and abetting possession with intent to distribute five grams or more of cocaine base. Defendant appealed. The Court of Appeals, Buckley, Circuit Judge, held that: (1) asking undercover officer if he was "looking" and referring him to "buddy" for more crack cocaine could be found to be aiding and abetting possession with intent to distribute five grams or more of cocaine base; (2) defendant did not accept responsibility; and (3) defendant did not willfully obstruct justice by failing to turn herself in after missing arraignment.

Conviction affirmed, sentence vacated, and case remanded.

West Headnotes (6)

**[1]    Controlled Substances**🔑Aiders and Abettors

Asking undercover officer if he was "looking" and referring him to "buddy" for more crack cocaine could be found to be aiding and abetting possession with intent to distribute five grams or more of cocaine base, even though nothing indicated that defendant took any direct action to aid and abet possession of the drugs; transactions took place in defendant's yard, and evidence indicated that defendant procured

customer and served to maintain market. 18 U.S.C.A. § 2; Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(a)(1), (b)(1)(B)(iii), 21 U.S.C.A. § 841(a)(1), (b)(1)(B)(iii).

4 Cases that cite this headnote

**[2]    Controlled Substances**🔑Aiders and Abettors

One may abet possession with intent to distribute by acting as middleman, by procuring customers and maintaining market in which possession is profitable, even though defendant does nothing else to help possessor get or retain possession. 18 U.S.C.A. § 2; Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(a)(1), (b)(1)(B)(iii), 21 U.S.C.A. § 841(a)(1), (b)(1)(B)(iii).

1 Cases that cite this headnote

**[3]    Controlled Substances**🔑Aiders and Abettors

To convict for aiding and abetting possession with intent to distribute, government need not show that defendant served as lookout or took active role in getting or protecting drugs; it is enough for Government to establish defendant's involvement in general scheme, thereby assisting or encouraging possession with intent to distribute. 18 U.S.C.A. § 2; Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(a)(1), (b)(1)(B)(iii), 21 U.S.C.A. § 841(a)(1), (b)(1)(B)(iii).

4 Cases that cite this headnote

**[4]    Sentencing and Punishment**🔑Acceptance of Responsibility

Defendant's    testimony    disagreeing    with

undercover police version that defendant directed officer to her "buddy" for more crack cocaine (defendant testified that she told officer that he could get more from "anybody") was disavowal representing failure to accept responsibility for aiding and abetting possession with intent to distribute cocaine base; thus, defendant was not entitled to two-level decrease in offense level. 🚩 U.S.S.G. § 3E1.1, comment. (n.5), 18 U.S.C.A.App.; 🚩 § 3E1.1(a) (1991).

1 Cases that cite this headnote

**[5]   Sentencing and Punishment**⚬Obstruction of Justice

The 1989 version of sentencing guideline for obstruction of justice reaches failure to appear. 🚩 U.S.S.G. §§ 3C1.1, 🚩 3C1.1, comment. (nn.1, 3), 18 U.S.C.A.App.

5 Cases that cite this headnote

**[6]   Sentencing and Punishment**⚬Obstruction of Justice

Defendant's initial failure to appear at arraignment was not "willful obstruction of justice," because the letter announcing it arrived one day after the hearing; nor did her subsequent failure to turn herself in constitute a "willful obstruction of justice," because the defendant placed several calls to pretrial services to determine what was required, and that office confused her, failed to answer her questions and did not provide her with instructions; thus two-level increase in sentencing was not warranted. 🚩 U.S.S.G. § 3C1.1, 18 U.S.C.A.App.

10 Cases that cite this headnote

**\*1371 \*\*101** Appeal from the United States District Court for the District of Columbia (D.C.Crim. No. 90-00399-01).

**Attorneys and Law Firms**

Howard Bramson (appointed by this court) for appellant.

James H. Dinan, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Thomas C. Black, and Randall D. Eliason, Asst. U.S. Attys., were on the brief, for appellee.

Before MIKVA, Chief Judge, and SILBERMAN and BUCKLEY, Circuit Judges.

**Opinion**

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Monica Monroe challenges the sufficiency of the evidence produced at trial to support her conviction for aiding and abetting the possession with intent to distribute **\*1372 \*\*102** five grams or more of cocaine base under 🚩 21 U.S.C. §§ 841(a) and (b)(1)(B)(iii) and 18 U.S.C. § 2. Monroe also challenges her sentence. We find that the Government produced sufficient evidence to support her conviction and that the trial court correctly denied Monroe's request for a reduction in her sentence for acceptance of responsibility. We agree with Monroe, however, that the court erred by granting the Government's request for an enhancement to her sentence for obstruction of justice. We therefore vacate the sentence and remand the case for resentencing.

I. BACKGROUND

On August 28, 1990, plainclothes police officers investigating narcotics activity in the 5000 block of F Street, S.E., in Washington, D.C., observed what appeared to be narcotics transactions in the backyard of 5036 F Street, S.E. As one of the undercover officers moved closer, most of the people in the yard of 5036 F

Street left, but a man and woman sitting a few feet apart from each other remained. The man was later identified as Robert Beckham, and the woman as the appellant, Monica Monroe.

Monroe asked the officer "if he was looking," and sold him 0.41 grams of cocaine base at a purity level of 89 percent. When the officer asked if he could obtain additional crack cocaine, Monroe replied, according to the police, "I only have this one, but you can get one from my buddy," indicating Robert Beckham. Monroe testified that she told the officer he "could get one from anybody out here."

At that point, Beckham stood up, walked to the bench on which Monroe was sitting, leaned down next to it, and picked up a plastic bag containing 34 additional pieces of cocaine base, which weighed a total of 13.02 grams with a purity level of 89 percent. As Beckham sat down on the bench next to Monroe and began to untie the bag, the police officer grabbed it and placed them both under arrest.

The original two-count indictment, filed September 27, 1990, charged Monroe with unlawful distribution of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and possession with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii) and 18 U.S.C. § 2 (the aiding and abetting statute). Although charged jointly, Beckham and Monroe were not tried together because Monroe did not appear at the original arraignment, which was scheduled for October 11, 1990.

In explanation of her absence from that proceeding, she asserts that her family did not receive the arraignment notice sent to her home until the day after the scheduled arraignment. Monroe's counsel stated at sentencing that she was in Philadelphia that day and that when she learned of the arraignment notice, she immediately called Pretrial Services and spoke with a Miss Bergin. Miss Bergin instructed Monroe to call back. Monroe did so several times, but she claims that Miss Bergin never told her what action to take. *Transcript of Proceedings,* August 20, 1991, at 3-4.

On December 21, 1990, Monroe was arrested on an outstanding bench warrant issued by the trial court on October 11, 1990. The court had severed Monroe's case from Robert Beckham's, and her trial commenced on March 5, 1991. At trial, the arresting officer testified that the 34 ziplock bags contained pieces of crack cocaine that appeared to be the same size and color as the piece he was

given by Monroe. Officer David Stroud, an expert on the use, distribution, and packaging of illegal drugs, testified that most street level drug operations employ more than one person. He described the role of the "runner" (the person who secures customers for the drugs and at times has some to sell) and the "holder" (the person who controls the drugs and the money). Officer Stroud also stated that drugs of identical purity could very well have come from the same larger piece of crack cocaine.

Monroe moved unsuccessfully for a judgment of acquittal at the close of the Government's case-in-chief, and again at the close of her evidence. On March 7, 1991, the jury returned a verdict of guilty on both counts charged, namely, unlawful distribution of cocaine base and possession *1373 **103 with intent to distribute cocaine base. On August 20, 1991, the court sentenced appellant to concurrent terms of imprisonment of 78 months on each count, to be followed by concurrent terms of supervised release of three years on the first count and four years on the second.

## II. DISCUSSION

### A. Sufficiency of the Evidence

[1] Monroe argues that there was insufficient evidence to support her conviction for aiding and abetting possession with intent to distribute five grams or more of cocaine base.

As we have stated on numerous occasions, "[t]he standard for overturning a guilty verdict on the grounds of insufficiency of evidence is ... a demanding one." *United States v. Lam Kwong-Wah,* 924 F.2d 298, 302 (D.C.Cir.1991). We are "not a second jury weighing the evidence anew." *United States v. Poston,* 902 F.2d 90, 94 (D.C.Cir.1990). Rather, our role is limited to determining "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

The United States Code provides that "[w]hoever ... aids, abets, counsels, commands, induces or procures [the] commission [of a crime] is punishable as a principal." 18

U.S.C. § 2(a) (1988). Under the "classic interpretation" of this offense,

> [i]n order to aid and abet another to commit a crime it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." L. Hand, J., in *United States v. Peoni,* 100 F.2d 401, 402 [ (2d Cir.1938) ].

*United States v. Raper,* 676 F.2d 841, 849 (D.C.Cir.1982) (quoting *Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949)).

Monroe invokes our opinion in *United States v. Poston,* 902 F.2d 90 (D.C.Cir.1990), to argue that she may not be convicted of aiding and abetting possession with intent to distribute unless evidence is introduced of some affirmative conduct connecting her to Beckham's drug activities. In *Poston,* Monroe notes, we found that the defendant not only drove the seller to the point of sale, but acted as a lookout. *Id.* at 95. She contends that the evidence adduced at her trial shows only that she was present at the scene of the crime and that such presence qualifies as aiding and abetting only when it intentionally encourages or facilitates the criminal act. Monroe argues that her case is distinguishable from *Poston* because there was no evidence that she had taken any direct action to aid and abet Beckham's possession of the drugs at issue.

Monroe's analysis reflects some confusion over what evidence we require to support a conviction for aiding and abetting another's possession with intent to distribute. Monroe apparently suggests that the Government must show that she played some physical role, such as serving as a lookout, in securing or retaining possession of the drugs. The issue before us, then, is whether proof of Monroe's involvement in any aspect of Beckham's operation is enough to uphold her conviction.

It is true that in *United States v. Raper,* in a footnote discussing *United States v. Jackson,* 526 F.2d 1236 (5th Cir.1976), a case on which Raper relied, we indicated that *Jackson* held only that "one convicted of aiding or abetting the crime of possession with intent to distribute must give the required statutory support to the *possession* element of the offense as well as the intent to distribute." 676 F.2d at 851 n. 1 (emphasis in original). That statement, however, was not an endorsement of the Fifth Circuit's requirement of affirmative evidence that the defendant at some point actually or constructively

possessed the drugs. We have since made our position on this point clear.

[2]  In *United States v. Garrett,* 720 F.2d 705 (D.C.Cir.1983), we wrote that **104 *1374** "*Jackson* ignores the breadth of the aiding and abetting statute." *Id.* at 713 n. 4. We also affirmed that "18 U.S.C. § 2 codified the common law relating to accessories, making one who assists the perpetrator of the crime while sharing the requisite criminal intent liable as a principal." *Id.* at 713 (internal quotes omitted). We explained that to sustain a conviction for aiding and abetting, "all that is necessary is to show some affirmative participation which at least encourages the principal offender to commit the offense, with all its elements, as proscribed by the statute." *Id.* at 713-14. Thus, one may "abet" the crime of possession with intent to distribute by acting as a middleman, by "procuring the customers and maintaining the market in which the possession is profitable, even though [the defendant does] nothing else to help the possessor get or retain possession." *United States v. Wesson,* 889 F.2d 134, 135 (7th Cir.1989) (joining this circuit "in saying *nay* to *Jackson* ").

[3]  Under the law of this circuit, therefore, the Government need not show that appellant served as a lookout, or even that she took some active role in getting or protecting the drugs. It is enough for the Government to establish Monroe's involvement in the general scheme, thereby assisting or encouraging Beckham's possession of the drugs with intent to distribute them. The evidence is sufficient to support Monroe's conviction if the Government proves that Monroe acted as a middleman-"procuring the customers and maintaining the market in which the possession is profitable." *Wesson,* 889 F.2d at 135.

Viewed in the light most favorable to the Government, the evidence shows that Monroe procured a customer and served to "maintain the market" by asking the officer if he was "looking," and referring him to Beckham with the remark that he could "get one from my buddy." When combined with the expert testimony and the acknowledged fact that these transactions had taken place in her yard, we find this evidence more than sufficient to persuade a rational trier of facts that Monroe was guilty beyond a reasonable doubt.

**B. Acceptance of Responsibility**
[4]  Monroe argues that she should have received a two-level decrease in her offense level for acceptance of

responsibility. Monroe notes that she admitted under oath that she sold narcotics to a police officer and that she contested only one piece of evidence at trial: the characterization of her response to the police officer's request for more cocaine base. Monroe testified that she answered "you can get one from anybody," while the police version has her answering that "you can get one from my buddy." As this is a factual disagreement, and not a legal one, Monroe argues that she is entitled to this reduction.

Under the *Sentencing Guidelines,* "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct," the offense level will be reduced by two levels. U.S.S.G. § 3E1.1(a) (November 1990). The commentary to this section highlights the district court's "unique position to evaluate a defendant's acceptance of responsibility." *Id.,* comment. (n. 5). In recognition of this unique position, the trial court is entitled to "great deference on review." *Id.*

This court has made clear that denial of this adjustment is warranted when the defendant fails to accept responsibility for all conduct related to the offense of conviction. *United States v. Taylor,* 937 F.2d 676, 680-81 (D.C.Cir.1991). Monroe's rejection of the police officer's version of the events constitutes much more than a disagreement over the characterization of her conduct. Rather, her version of the events constitutes a disavowal of any involvement with Beckham and the 34 grams of cocaine base he pulled from beneath the bench. This disavowal represents a failure to accept responsibility for the conduct related to the charge of aiding and abetting possession with intent to distribute cocaine base. The trial court did not abuse its wide discretion, therefore, in denying this adjustment to appellant's sentence.

C. Obstruction of Justice

[5] Monroe submits that the trial court erred by imposing a two-level increase on **\*1375 \*\*105** her sentence for obstruction of justice based on her failure to appear at the October 1990 arraignment. To begin with, she argues, it was not until the 1990 Guidelines Manual became effective (in November 1990 and after the conduct at issue here) that the *Application Notes* to guideline 3C1.1 described a defendant's willful failure to appear as an "obstruction of justice;" furthermore, application of the 1990 Manual to an offense that occurred prior to the effective date of those amendments violates the

Constitution's *Ex Post Facto* Clause. Second, Monroe argues that her conduct was not willful; therefore, an increase under either the 1989 or the 1990 Guidelines Manual is not warranted.

*1. Application Notes*

The 1989 version of the *Application Notes* for guideline 3C1.1 included a list of conduct that, "while not exclusive," provided "a basis for applying" a two-level increase for the willful obstruction of justice. U.S.S.G. § 3C1.1, comment. (n. 1) (November 1989). That non-exclusive list did not include "failure to appear." The 1990 version of the *Notes,* however, included in *its* "non-exhaustive" list of "types of conduct" to which the guideline applied, "escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding...." U.S.S.G. § 3C1.1, comment. (n. 3(e)) (November 1990). In other words, the amendment to the *Notes* merely adds another example of the kind of conduct that is to be found obstructive; it does not change the reach of the guideline itself.

Other circuits have found that the version of the guideline in effect in 1989 reached failure-to-appear or similar conduct. *See id.;* *United States v. Teta,* 918 F.2d 1329, 1334-35 (7th Cir.1990) ("defendant's willful failure to appear"); *United States v. Perry,* 908 F.2d 56, 59 (6th Cir.1990) (defendant "jumped bond before sentencing"); *United States v. Avila,* 905 F.2d 295, 297 (9th Cir.1990) (defendant "absconded from supervised [pretrial] release and remained a fugitive for five months"); *United States v. Keats,* 937 F.2d 58, 67 (2d Cir.) ("intentional flight from judicial proceedings is sufficient to support imposing an obstruction enhancement"), *cert. denied,* 502 U.S. 950, 112 S.Ct. 399, 116 L.Ed.2d 348 (1991); *United States v. St. Julian,* 922 F.2d 563, 571 (10th Cir.1990) (failure to appear at sentencing hearing constitutes obstruction of justice, though defendant subsequently turned himself in). We are in accord. If giving a false name at the time of arrest can be said to "impede" justice, then surely the failure to appear at a judicial proceeding may be said to do the same. Because we find that the change in the *Application Notes* did not effect a change in the guideline, we do not reach appellant's *ex post facto* argument.

U.S. v. Monroe, 990 F.2d 1370 (1993)

301 U.S.App.D.C. 100

*2. Willful Failure to Appear*

[6] The question remains whether Monroe's conduct constituted a *willful* obstruction of justice. U.S.S.G. § 3C1.1 (November 1989).

The trial court found that Monroe acted willfully because she "failed to turn herself in after she realized that she had missed her arraignment date," and because she "knew, or should have known, that she was not to have left the District of Columbia." *Transcript of Proceedings,* August 20, 1991, at 2, 5. The Government suggests that *United States v. Teta,* 918 F.2d 1329, 1334 (7th Cir.1990), and *United States v. Perry,* 908 F.2d 56, 59 (6th Cir.1990), provide support for this proposition. We do not agree.

In *Teta,* the defendant confused two Wisconsin cities beginning with the letter "M," travelled to Milwaukee instead of Madison, and thereby missed an arraignment scheduled for August 1, 1989. *Teta,* 918 F.2d at 1331. Teta telephoned the Clerk of the Court to arrange a new date. *Id.* According to the deputy clerk, Teta agreed to a rescheduled appearance for August 4. Teta claimed that they had agreed to an appearance on August 11. He was arrested on a bench warrant when he failed to appear for the August 4 hearing. *Id.* at 1331-32.

The district court credited the deputy clerk's testimony, and thus it "found that **\*1376 \*\*106** Teta fully understood the mandate to appear on August 4 after he had missed the August 1 arraignment." *Teta,* 918 F.2d at 1334. This evidence provided the basis for finding that Teta's second failure to appear was willful, "because he knew the requirements and yet voluntarily and intentionally failed to appear." *Id.*

Similarly, in *United States v. Perry,* the defendant was instructed to report for an interview with a probation officer on August 2, 1988, but failed to keep the appointment. 908 F.2d 56, 58 (6th Cir.1990). On appeal, the court noted that Perry admitted to having disobeyed an explicit instruction to keep the appointment and stated that this was "enough" to find an obstruction of justice. *Id.* at 59.

These decisions flow logically from the definition of the word "willful," which, this court has suggested, "requires that the defendant consciously act with the purpose of obstructing justice." *United States v. Thompson,* 962 F.2d 1069, 1071 (D.C.Cir.1992) (citing *United States v. Lofton,* 905 F.2d 1315, 1317 (9th Cir.1990)). Central to both *Teta* and *Perry* was the defendant's knowledge of the requirements placed upon him by the court and his

conscious decision to ignore its mandate.

In this case, by contrast, Monroe presented unrebutted evidence that the letter announcing the arraignment arrived at her address one day after that hearing took place. *Transcript of Proceedings,* August 20, 1991, at 3. Her initial failure to appear cannot therefore be labelled "willful," as she could not have ignored a mandate that she had not received.

As to Monroe's failure to turn herself in, the record indicates that Monroe made affirmative and documented efforts to determine what action was required of her by placing several calls to Pretrial Services. That office confused her; it failed to answer her questions and did not provide her with explicit instructions. *Id.* at 3-4. Unlike *Teta,* there is no evidence in the record that Monroe made a second appointment. Unlike *Perry,* there *is* evidence that Monroe was never told what action to take. Perhaps most importantly, defense counsel informed the court that Miss Bergin, of Pretrial Services, was prepared to testify in support of Monroe's account of the events. *Transcript of Proceedings,* August 20, 1991, at 4. As that offer was not accepted, nor counsel's account of Monroe's efforts rebutted, we must assume that she tried to discover what was required of her but gave up the effort after several attempts.

We "will uphold the district court's sentence so long as it results from a correct application of the guidelines to factual findings which are not clearly erroneous." *United States v. Barry,* 938 F.2d 1327, 1332 (D.C.Cir.1991) (citations omitted). On this record, where the Government has presented no evidence to contradict Monroe's version of the events, we find that the trial court clearly erred in holding that Monroe acted willfully. We therefore find that the two-level enhancement for willful obstruction of justice cannot be upheld.

### III. CONCLUSION

The Government provided sufficient evidence from which a rational juror could have found Monroe guilty beyond a reasonable doubt of aiding and abetting possession with the intent to distribute. Under the law of this circuit, it is enough that her help in attracting customers and maintaining a market for Beckham's drug transactions was such that his possession of the drugs was profitable. As to appellant's sentence, it is clear that Monroe did not accept responsibility for the conduct for which she was

**U.S. v. Monroe, 990 F.2d 1370 (1993)**

301 U.S.App.D.C. 100

charged. There is no evidence in the record, however, to support the enhancement for willful obstruction of justice.

Accordingly, we affirm appellant's conviction but vacate her sentence and remand to the trial court for resentencing consistent with this opinion.

*So ordered.*

**All Citations**

990 F.2d 1370, 301 U.S.App.D.C. 100

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

593 F.Supp.2d 140
United States District Court,
District of Columbia.

UNITED STATES of America
v.
Michael C. IRVING, Defendant.

Criminal No. 07–0107 (PLF).
|
Jan. 14, 2009.

**Synopsis**
**Background:** Defendant was convicted on income tax charges and fraud. Government sought upward modification for obstruction of justice on allegations of perjury.

**Holdings:** The District Court, Paul L. Friedman, J., held that:

[1] defendant's testimony that when he and others had filed late returns in the past they had faced, at most, late filing penalties and no criminal investigation or prosecution, was not false or intended to deceive;

[2] defendant's response to questions as to whether he believed he had "committed any crime" or was "guilty of any of the crimes with which you are charged," was immaterial;

[3] series of questions leading up to defendant's answers that were ambiguous, given context in which they were asked and answered, could not be considered perjurious; and

[4] increase of defendant's potential sentence for obstruction was not warranted based on one statement from nearly two days of testimony by defendant.

Ordered accordingly.

West Headnotes (5)

[1]     **Sentencing and Punishment** ⚑ Obstruction of

justice

In order for an obstruction of justice adjustment to apply, a court must find that the defendant (1) gave false testimony, (2) concerning a material fact, (3) with the intent to deceive, rather than as a result of confusion, mistake or faulty memory.
⚑ U.S.S.G. § 3C1.1, 18 U.S.C.A.

[2]     **Sentencing and Punishment** ⚑ Obstruction of
justice

Defendant's testimony regarding his experience with having filed tax returns late in prior years and knowing of other persons who had filed their taxes late, and his apparently true assertions that when he and others had filed late in the past they had faced, at most, late filing penalties and no criminal investigation or prosecution, was not false or intended to deceive, and thus was not perjurious, as required for upward modification of his sentence on income tax charges and fraud for obstruction of justice. ⚑ U.S.S.G. § 3C1.1, 18 U.S.C.A.

[3]     **Sentencing and Punishment** ⚑ Obstruction of
justice

Defendant's response to questions as to whether he believed he had "committed any crime" or was "guilty of any of the crimes with which you are charged," was immaterial to government's claim that defendant had obstructed justice, and thus could not support upward modification of his sentence on income tax charges and fraud on basis of perjury; question of guilt was ultimate question for jury, and not a question, the answer to which, was either objectively true or false.
⚑ U.S.S.G. § 3C1.1, 18 U.S.C.A.

**[4]    Sentencing and Punishment**⚑—Obstruction of justice

Series of questions leading up to defendant's answers that were ambiguous, given context in which they were asked and answered, could not be considered perjurious, as required for upward modification of his sentence on income tax charges and fraud for obstruction of justice. ⚑ U.S.S.G. § 3C1.1, 18 U.S.C.A.

**[5]    Sentencing and Punishment**⚑—Obstruction of justice

Increase of defendant's potential sentence for obstruction was not warranted based on one statement from nearly two days of testimony by defendant. ⚑ U.S.S.G. § 3C1.1, 18 U.S.C.A.

**Attorneys and Law Firms**

**\*141** Karen E. Kelly, U.S. Department of Justice, Washington, DC, for Plaintiff.

David Schertler, Schertler & Onorato, L.L.P., Washington, DC, for Defendant.

*MEMORANDUM OPINION*

PAUL L. FRIEDMAN, District Judge.

Under ⚑ Section 3C1.1 of the United States Sentencing Guidelines, the base offense level may be increased by two levels if the defendant "willfully obstructed or

impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," and if the obstructive conduct related to "the defendant's offense of conviction and any relevant conduct; or ... a closely related offense...." *See* ⚑ U.S.S.G. § 3C1.1. Committing perjury is an example of the type of conduct to which this adjustment applies, so long as such perjury "pertains to conduct that forms the basis of the offense of conviction." ⚑ U.S.S.G. § 3C1.1, app. note 4(b). While it now is clear that the prosecution must demonstrate the applicability of this provision only by a preponderance of the evidence, the Sentencing Commission has emphasized that ⚑ Section 3C1.1 is not intended to punish a defendant for the exercise of his constitutional rights, including the right to testify on his own behalf at trial, and it has cautioned that "not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." ⚑ U.S.S.G. § 3C1.1, app. note 2.

[1] In order for this adjustment to apply, the Court must find that the defendant (1) gave false testimony, (2) concerning a material fact, (3) with the intent to deceive, rather than as a result of confusion, mistake or faulty memory. *See* ⚑ *United States v. Dunnigan,* 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993); *United States v. Smith,* 374 F.3d 1240, 1245 (D.C.Cir.2004). As the Supreme Court has explained:

[N]ot every accused who testifies at trial and is convicted will incur an enhanced sentence ... for committing perjury.... [Rather,] if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to, or obstruction **\*142** of, justice, or an attempt to do the same, under the perjury definition we have set out.

⚑ *United States v. Dunnigan,* 507 U.S. at 95, 113 S.Ct. 1111.

The matter is complicated in this case because with

U.S. v. Irving, 593 F.Supp.2d 140 (2009)

respect to the two counts of the indictment on which the defendant was convicted (Counts 5 and 9), the jury necessarily found that the defendant had the requisite intent or else it could not have found him guilty. This suggests that the jury rejected his good faith defense under 🔖 *Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1990). The Court's own evaluation of the evidence also convinces the Court that the government proved the necessary intent with respect to Counts 5 and 9; if this were a bench trial, the Court would have rejected the *Cheek* defense with respect to these counts. Furthermore, as indicated by its Memorandum Opinion and Order of January 13, 2009, 2009 WL 89655, the Court will consider both uncharged conduct and conduct on which the jury could not reach a verdict and therefore was hung in calculating the tax loss that establishes the base offense level. This is because the Court has found by a preponderance of the evidence that the defendant had the requisite state of mind with respect to Counts 3, 4, 7 and 8, as well as with respect to the two acts of uncharged conduct.[1] The government argues that it follows ineluctably that the Court must find by a preponderance of the evidence that the defendant perjured himself and thus must adjust the base offense level upward by two levels under 🔖 Section 3C1.1. The Court does not agree.

The government has identified in its sentencing memorandum seven excerpts from the direct testimony of the defendant at trial as its exclusive basis for urging the Court to find perjury and hence obstruction under 🔖 Section 3C1.1. *See* Government's Sentencing Memorandum at 8–12. The Court inquired at oral argument on November 6, 2008 whether these were the only instances of alleged perjury on which the government relied in urging the upward adjustment, and the government said they were. *See* Transcript of Hearing at 62–63 (Nov. 6, 2008). The Court therefore must analyze separately each of the seven excerpts on which the government relies and make particularized findings with respect to whether perjury has been established. *See* 🔖 *United States v. Dunnigan,* 507 U.S. at 95–97, 113 S.Ct. 1111. In doing so, the Court has attempted to put each of the defendant's allegedly perjurious statements in context by reading the entirety of his testimony at trial, and particularly the questions and answers in the few pages immediately preceding and immediately following the allegedly perjurious statements.

[2] Having engaged in that analysis, the Court cannot conclude by a preponderance of the evidence that the second and third of the seven excerpts relied upon by the government, *see* Transcript of Trial at page 178, lines 11–16 (May 12, 2008); *id.* at page 189, lines 16–17, meet the definition of perjury discussed in *Dunnigan.* The second and third excerpts relate to the defendant's experience with having filed tax returns late in prior years and knowing of others who had filed their taxes late, and his apparently true assertions that when he and others filed late in the past they faced (at most) late filing penalties and no criminal investigation or prosecution. *See, e.g.,* Transcript of Trial at page 177, line 16 to page 178, line 6 (May 12, 2008); *id.* at page 189, lines 9–15; Transcript of Trial at 31, line 25 to page 36, line 4 (May 13, 2008—afternoon session). **\*143** Thus, the Court cannot find by a preponderance of the evidence that these statements, in context, were false or intended to deceive.

[3] With respect to the fourth and seventh allegedly perjurious statements in which the defendant responded to questions as to whether he believed he had "committed any crime" or was "guilty of any of the crimes with which you are charged," Transcript of Trial at page 195, lines 6–11 (May 12, 2008); *id.* at page 210, lines 3–5, the Court concludes that the defendant's views on the question of his legal guilt or innocence are immaterial. The question of guilt is a question of law, and the defendant is not a lawyer. To answer the questions put to him completely "truthfully" would require the defendant either to have an independent knowledge of the law or to have thoroughly considered and reviewed the Court's carefully constructed jury instructions in this case which had not even been finalized at the time the defendant testified. In addition, the question of guilt is the ultimate question for the jury and not a question the answer to which is either objectively true or false.

[4] That having been said, there still are three remaining excerpts on which the government relies for its request for a two-level upward adjustment under 🔖 Section 3C1.1: the first, fifth and sixth of the government's seven excerpts. They are as follows:

Q (Mr. Schertler): At any time did you think, or did you come to believe there was anything wrong with you declaring exempt?

A (Defendant): At no time from 2002 until 2006 did I ever think that anything was wrong with these forms right here of claiming exempt W–4 or D–4.

Transcript of Trial at page 133, lines 11–15 (May 12, 2008).

Q (Mr. Schertler): Did you ever believe that this was something that you could get in trouble for?

A (Defendant): No.

Q (Mr. Schertler): Did you ever believe that this was something for which you could be charged with crimes violating the federal and D.C. tax laws?

A (Defendant): Not at that time.

Q (Mr. Schertler): At any time prior to October 10, 2006, did you believe that you could get into trouble? Did you believe that what you were doing was a crime?

A (Defendant): Not prior to October the 10th.

*Id.* at page 198, lines 3–13.

Q (Mr. Schertler): During this time period when you did not file your 2003, 2004 and 2005 tax returns, did you believe in your mind that you were violating any provisions of the tax laws of the United States of America?

A (Defendant): Under no circumstances.

*Id.* at page 209, lines 2–6.

[5] The Court concludes that the series of questions leading up to the defendant's answers in the fifth and sixth excerpts were ambiguous. Given the context in which they were asked and answered, it is not at all clear that

Mr. Irving willfully intended to provide false testimony. The questions asked by counsel in the fifth excerpt were particularly opaque, and the "time period" covered by the question in the sixth excerpt is unclear. Thus, the Court cannot conclude by a preponderance of the evidence that Mr. Irving's answers to these questions amounted to perjury. While the answer to the question in the first excerpt is more definitive and encompasses all of the relevant years, the Court **144 is reluctant to increase the defendant's potential sentence for obstruction based on this one statement from nearly two days of testimony by the defendant. *Cf. United States v. Safavian,* 461 F.Supp.2d 76, 88 (D.D.C.2006) (the Court was particularly reluctant to adjust upward under Section 3C1.1 in subjective areas involving intent and willfulness).[2] The Court therefore will not grant the government's request for a two-level upward adjustment under Section 3C1.1.

SO ORDERED.

**All Citations**

593 F.Supp.2d 140

**Footnotes**

1   The Court will explain its reasoning orally at the sentencing on January 14, 2009.

2   While there is much in the defendant's testimony that the Court does not credit, the government has the burden of proof when seeking an upward adjustment and it has identified only the seven excerpts just discussed in seeking an upward adjustment under Section 3C1.1 of the Guidelines.

   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.